STATE OF NORTH CAROLINA v. DANIEL THOMAS GARNER

No. 263A91

(Filed 25 June 1992)

1. **Searches and Seizures § 32 (NCI3d) — exclusionary rule — illegal seizure under warrant — inevitable discovery exception adopted**

   The trial court did not err in a murder and robbery prosecution by admitting into evidence a copy of a pawn shop receipt and Bureau of Alcohol, Tobacco and Firearms records of the purchase of a gun by defendant where those documents were obtained derivatively from a search of defendant's residence supported by a warrant based on a partially incorrect probable cause affidavit, but the court found that "but for" the information found at defendant's residence officers would have conducted a routine check and discovered the duplicate receipt and ATF records at the pawnshop by lawful means. The inevitable discovery exception to the Fourth Amendment exclu-

sionary rule is adopted. The case by case approach of *United States v. Silvestri*, 787 F.2d 736, is adopted for determining whether proof of an ongoing, independent investigation is necessary to show inevitability.

**Am Jur 2d, Evidence §§ 412, 415, 416, 416.5.**

**What circumstances fall within "inevitable discovery" exception to rule precluding admission, in criminal case, of evidence obtained in violation of Federal Constitution. 81 ALR Fed 331.**

2. **Searches and Seizures § 32 (NCI3d)— illegal search—inevitable discovery exclusion—burden of proof of inevitability**

The trial court's application of the inevitable discovery doctrine did not violate a defendant's Fourth Amendment rights where, although police first learned the identity of the gun merchant from whom defendant purchased the weapon through an illegal search, a police investigator testified that, had a pawnshop receipt not been found at defendant's residence, the serial number of the weapon seized during the permissive search where defendant was arrested would have been run through a PIN and ATF records check, officers testified that it was normal procedure to check ATF and PIN records, the pawnshop did in fact file the documentation required upon the sale of a firearm, and an independent inquiry of the ATF would have produced the reference to the pawnshop. The U.S. Supreme Court held in *Nix v. Williams*, 467 U.S. 431, that the burden of proof of inevitability was preponderance of the evidence and, since defendant offered no evidence, the State thus proved inevitable discovery by a preponderance of the evidence.

**Am Jur 2d, Evidence §§ 412, 415, 416, 416.5.**

**What circumstances fall within "inevitable discovery" exception to rule precluding admission, in criminal case, of evidence obtained in violation of Federal Constitution. 81 ALR Fed 331.**

3. **Searches and Seizures § 32 (NCI3d)— exclusionary rule— inevitable discovery exception—North Carolina Constitution**

The Supreme Court rejected the contention of a robbery and murder defendant that derivative evidence obtained from

STATE v. GARNER

[331 N.C. 491 (1992)]

an illegal search should have been suppressed because the exclusionary rule arising from Article I, Section 20 of the North Carolina Constitution does not and should not contain an inevitable discovery exclusion. While the Supreme Court has held that Article I, Section 20 of the North Carolina Constitution, like the Fourth Amendment to the United States Constitution, prohibits unreasonable searches and seizures and requires the exclusion of evidence obtained by unreasonable search and seizure, there is nothing to indicate anywhere in the text of Article I, Section 20 any enlargement or expansion of rights beyond those afforded in the Fourth Amendment as applied to the states by the Fourteenth Amendment.

**Am Jur 2d, Evidence § 416.5.**

**What circumstances fall within "inevitable discovery" exception to rule precluding admission, in criminal case, of evidence obtained in violation of Federal Constitution. 81 ALR Fed 331.**

4. **Searches and Seizures § 32 (NCI3d) — exclusionary rule — inevitable discovery exception — absence of bad faith by officers**

The trial court did not err in a robbery and murder prosecution by ruling that the question of bad faith on the part of investigating officers was irrelevant in the proper application of the inevitable discovery doctrine. Although defendant contended that the parameters of the inevitable discovery doctrine should be narrowly drawn in order to preserve the deterrence value of the exclusionary rule, the trial court's suppression of primary evidence, while not necessary in its application of the doctrine of inevitable discovery, unquestionably served the deterrence objective because the risk of suppression inherently preserves the deterrence value of the exclusionary rule. Further, if the State carries its burden and proves inevitable discovery by separate, independent means, thus leaving the State in no better and no worse position, any question of good faith, bad faith, mistake or inadvertence is irrelevant.

**Am Jur 2d, Evidence § 416.5.**

**What circumstances fall within "inevitable discovery" exception to rule precluding admission, in criminal case, of**

STATE v. GARNER

[331 N.C. 491 (1992)]

evidence obtained in violation of Federal Constitution. 81 ALR Fed 331.

5. **Evidence and Witnesses § 380 (NCI4th) — murder — subsequent attempted murder — same weapon — admissible**

The trial court did not err in a murder prosecution by admitting testimony regarding a subsequent attempted murder by defendant where the evidence tended to prove the defendant's possession and control of the murder weapon at a time close to the murder. Although the evidence also showed defendant to be guilty of another crime of violence, it cannot be said that its only probative value was to show defendant's murderous propensities. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence §§ 321, 329.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed 781.**

6. **Evidence and Witnesses § 90 (NCI4th) — murder — subsequent attempted murder — probative value not outweighed by prejudice**

The trial court did not abuse its discretion in a murder prosecution by admitting evidence of a subsequent attempted murder where the evidence was significantly inculpatory and more directly linked defendant to the murder weapon than any other evidence presented. While the evidence would have some prejudicial effect, it could not be said that the trial court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence §§ 321, 329.**

**Admissibility, under Rule 404(b) of the Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts similar to offense charged to show preparation or plan. 47 ALR Fed 781.**

Justice FRYE concurring in the result.

Chief Justice EXUM joins in the concurring opinion.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of life imprisonment

entered by *Brewer, J.*, at the 15 October 1990 Criminal Session of Superior Court, CUMBERLAND County, upon a jury verdict of guilty of first-degree murder on theories of both premeditation and deliberation and felony murder. Defendant's motion to bypass the Court of Appeals as to his conviction of robbery with a dangerous weapon was allowed by this Court on 9 October 1991. Heard in the Supreme Court 14 February 1992.

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 23 January 1989 by a Cumberland County Grand Jury on the offenses of robbery with a dangerous weapon and the first-degree murder of Eva Gail Harrelson. Defendant pled not guilty. He was tried capitally to a jury at the 15 October 1990 Criminal Session of Superior Court, Cumberland County. The jury found the defendant guilty as charged of armed robbery and of first-degree murder on theories of both premeditation and deliberation and felony murder. Following a separate sentencing hearing, the jury recommended a sentence of life imprisonment for the murder conviction. In judgments entered 14 November 1990, Judge Brewer sentenced defendant to consecutive terms of life imprisonment for the murder and twenty-five years imprisonment for the armed robbery. Defendant appealed his murder conviction to this Court as a matter of right, and on 9 October 1991 this Court allowed his motion to bypass the North Carolina Court of Appeals with regard to his appeal of the armed robbery conviction.

At trial, the State presented evidence tending to show that Eva Gail Harrelson died on the evening of 27 October 1988 as a result of two gunshot wounds to the head which she sustained while working as a cashier at the BTO Food Store No. 1, located on Ramsey Street in Fayetteville. Ms. Harrelson had been employed by BTO Food Stores for about five months and knew the defendant as a regular customer of the store.

Sometime after midnight on 28 October 1988 two high school students stopped by the store and observed, through the open door of a storage room behind the checkout counter, Ms. Harrelson's

body lying face down in a pool of blood. The students called the police, and officers arrived within five to six minutes. Crime scene technicians conducted a search which produced several pieces of evidence, including two spent Federal .25 caliber shell casings near Eva Harrelson's body. Various items had been knocked off the counter and scattered about behind the cash register, which was jammed and reading "error." All the money was gone from the cash register except some change. The store manager testified that she had been acquainted with defendant for over a year and that he was a regular customer of the BTO store.

The State's evidence further showed that the defendant and one Brad Dickens met on 15 October 1988 and became friends who would go out and drink together. Dickens testified that during the period from 15 October until 28 October when the murder occurred, he had learned the defendant lived about two blocks behind the BTO store and that he had seen the defendant on a few occasions in possession of a small caliber automatic handgun, which Dickens identified at trial, the same being State's Exhibit 15.

Dickens also testified at trial that he met the defendant after work around 10:00 p.m. on 10 November 1988, and went with him to defendant's apartment and drank a few beers. Dickens testified that after they left the apartment, defendant told him that he had gone into the BTO store with a gun and told the clerk to give him the money. She had responded, "Danny, stop playing around. Put the gun away." Whereupon defendant said, "Listen bitch, I'm not playing." Defendant then took the money and shot her. Defendant also told Dickens that "they wouldn't suspect him because he lived right there and he came in all the time and they knew him."

On cross-examination, Dickens testified that, on the same night, 10 November 1988, after he and defendant had been riding around and drinking beer, they broke into a house on Lakecrest Drive. Dickens was charged with first-degree burglary in connection with that break-in. His testimony against defendant in the present case was pursuant to a proposed plea-bargain.

The State further offered the testimony of a driver for AAA Checker Cab Company, William Jackson, who testified that on 18 November 1988, some three weeks after the Harrelson murder, he was called to pick up a fare at the Express Stop on Ramsey Street. There he saw defendant get out of a white car driven

by a young woman later identified as Sherri Faulkner. Jackson took defendant as he requested through Linden in rural Cumberland County and turned onto a dirt road where defendant asked to be let out of the cab. Jackson then observed the white car approaching, driven by the same woman he had seen earlier. The defendant got out of the cab, seemed to be searching for his wallet, and then suddenly shot Jackson twice in the side and once in the back of the head.

Jackson slumped over and pretended to be dying. When he heard defendant talking to the woman, he sat up and began driving away. Faulkner and the defendant chased him in Faulkner's car until the cab driver slammed on the brakes, causing Faulkner to hit him and swerve into an embankment. Jackson then escaped and sought help.

On that same evening of 18 November 1988, following discovery of the abandoned car rented at that time to defendant and earlier driven by Faulkner, and armed with information that defendant was there, law enforcement officers went to the residence of Dana Adams and Angela Weems on Glen Reilly Road and were given permission to enter and search. They found defendant therein with Sherri Faulkner and arrested both. Among the items of evidence obtained at this location were a bank bag like the one missing from the BTO; a box of .25 caliber ammunition; the defendant's jacket, in the pockets of which were the keys to the rental car; and a .25 caliber Beretta handgun which the State's evidence established to be the weapon used in the BTO killing.

On 18 November 1988, subsequent to the arrest of defendant and recovery of the .25 caliber Beretta pistol, law enforcement officers obtained a warrant to search the defendant's residence. This search warrant was issued by a magistrate upon a finding of probable cause pursuant to: (1) an application therefor identifying the crime as the homicide of Eva Gail Harrelson on October 28, 1988 by Daniel Thomas Garner, the premises to be searched as 129 Treetop Dr., Apt. A, occupied by Daniel T. Garner; and (2) a probable cause affidavit by the investigating officers listing articles which they believed would be found therein, including .25 automatic ammunition, and giving a description of evidence to be seized which included ".25 caliber ammunition to analyze against spent shell casings and projectiles recovered from homicide." The inventory of property seized as a result of the search of said residence

included among eleven items the following: "P. Beretta Box showing model 950BS, serial number BR88945V from Jim's Pawn Shop; receipt from Jim's Pawn Shop showing a purchase of a Beretta PPGGG Model 950BS, SN#BR88945V on 20 Dec 86; five F.C., .25 auto bullets."

As a result of this seizure law enforcement officers went to Jim's Pawnshop in Fayetteville on 18 November 1988 and there obtained another copy of the Beretta pistol purchase receipt and a second document purporting to be defendant's Alcohol, Tobacco and Firearms application to purchase this pistol. Also on this date the State's firearms identification expert, S.B.I. Lab Technician, R.N. Marrs, concluded and communicated to Cumberland law enforcement officers that the spent casings found at the scene of the Jackson shooting and at the scene of the Harrelson homicide were fired from the same gun. However, contrary to a statement in the probable cause affidavit, the pistol taken from defendant's coat, when he was earlier arrested on 18 November at another location, was not delivered to the S.B.I. in Raleigh until 21 November, three days later. Thus, Agent Marrs had no firearm available for ballistics comparison on 18 November and was unable to say on 18 November, the date of the search warrant, that the pistol seized at defendant's arrest, or any specific .25 caliber pistol, was the gun used in both crimes. The probable cause affidavit supporting the search warrant was thus incorrect to this extent.

Prior to trial, the defendant moved to suppress all evidence obtained "as a direct or indirect result" of the search of his residence on the basis of the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 20 and 23 of the North Carolina Constitution. This motion thus included both the primary evidence (the gun box and the Jim's Pawnshop purchase receipt obtained at defendant's residence) as well as the derivative evidence (a copy or duplicate of said receipt and the Bureau of Alcohol, Tobacco and Firearms records of the purchase by the defendant) obtained by the officers from Jim's Pawnshop, the gun merchant.

In its pretrial hearing of defendant's suppression motion relating to the items seized from his residence, the trial court heard evidence, made a statement of principles of law affecting the "inevitable discovery" exception under Federal Constitutional cases, citing principally *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377 (1984), made findings of fact and conclusions of law, and entered orders

allowing the motion and excluding from evidence all items obtained directly from defendant's residence. The trial court, however, excepted from the orders the duplicate purchase receipt and the Bureau of Alcohol, Tobacco and Firearms (hereinafter ATF) records later obtained by the officers from the pawnshop itself, on the basis of the "inevitable discovery" doctrine.

The trial court allowed the motion as to the direct or primary evidence taken from defendant's residence, on the premise that the search warrant did not state sufficient facts to establish probable cause to search the residence. However, the court allowed into evidence the derivative evidence from the pawnshop upon findings (1) that it is standard or routine procedure in cases involving firearms to cause certain checks to be made including Police Information Network (hereinafter PIN) and ATF checks, and (2) that "but for" the fact the information was readily ascertainable by the pawn receipt found in defendant's residence the officers would have conducted a routine check and discovered the duplicate receipt and ATF records at Jim's Pawnshop by lawful means. The court thus concluded as a matter of law that the State had proven by a preponderance of the evidence that the information at Jim's Pawnshop would have been discovered inevitably by lawful means.

At trial the State introduced all items of evidence obtained from the permissive search of the residence where defendant was arrested, as well as the duplicate receipt showing the purchase of a .25 caliber Beretta pistol from Jim's Pawnshop, and the ATF documentation showing that the .25 caliber pistol seized at defendant's arrest was purchased by defendant on 20 December 1986 from Jim's Pawnshop. The State's firearms identification expert positively identified the two spent cartridge casings and a bullet recovered from the BTO store, the bullet removed from the victim during the autopsy, the three spent casings recovered from William Jackson's taxicab, and a bullet removed from Jackson's body as all having been fired from the pistol recovered from defendant's coat at the time of his arrest.

I.

[1]  The first issue raised by defendant on appeal is whether the trial court violated defendant's constitutional rights under the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution, by admitting into evidence, under an "inevitable discovery" exception to the exclusionary rule,

certain documents obtained derivatively from the search of defendant's residence tending to prove defendant's ownership of the murder weapon.

The ruling of the trial court here in question, in allowing the challenged evidence under an "inevitable discovery" exception to the Fourth Amendment exclusionary rule, was predicated in chief upon the opinion of the United States Supreme Court in *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377 (1984), delivered by Chief Justice Burger, in which the Supreme Court itself formally adopted this particular exception to the exclusionary rule. In so doing, it is worth noting the Court stated that "the 'vast majority' of all courts, both state and federal, recognize an inevitable discovery exception to the exclusionary rule." *Id.* at 440, 81 L. Ed. 2d at 385.

Since the *Nix* opinion in 1984, the "inevitable discovery" exception has been further advanced in numerous circuit court cases. *See, e.g., United States v. Mancera-Londono*, 912 F.2d 373 (9th Cir. 1990); *United States v. Terzado-Madruga*, 897 F.2d 1099 (11th Cir. 1990); *United States v. Evans*, 848 F.2d 1352 (5th Cir. 1988); *United States v. Whitehorn*, 813 F.2d 646 (4th Cir. 1987), *cert. denied*, 487 U.S. 1234, 101 L. Ed. 2d 931 (1988); *United States v. Silvestri*, 787 F.2d 736 (1st Cir. 1986), *cert. denied*, 487 U.S. 1233, 101 L. Ed. 2d 931 (1988); *United States v. Merriweather*, 777 F.2d 503 (9th Cir. 1985), *cert. denied*, 475 U.S. 1098, 89 L. Ed. 2d 898 (1986); *United States v. Cherry*, 759 F.2d 1196 (5th Cir. 1985); *United States v. Satterfield*, 743 F.2d 827 (11th Cir. 1984), *cert. denied*, 471 U.S. 1117, 86 L. Ed. 2d 262 (1985). As the defendant concedes, *Nix* dispels any doubt about the existence of the inevitable discovery doctrine under federal constitutional standards.

However, unlike the vast majority of jurisdictions, both state and federal, North Carolina law *does not yet include* this exception to the exclusionary rule in any form, and thus the central question presented by this case is whether this Court will put its imprimatur on the inevitable discovery doctrine. We conclude this doctrine should be adopted as a logical and meaningful extension of our law.

The Supreme Court, in setting its premise for establishing the inevitable discovery doctrine in *Nix*, related the historic "core rationale" for the exclusion of illegally obtained evidence as being the need to deter police from violations of constitutional protections, notwithstanding the drastic social cost of letting the obvious-

ly guilty go free; and the Court further related the breadth of the rule from its genesis in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 64 L. Ed. 319 (1920), to include not only the illegally obtained evidence itself but also other evidence derived from the primary evidence. In so doing the Court in *Nix* stated: "The holding of *Silverthorne* was carefully limited, however, for the Court emphasized that *such information* does not automatically become 'sacred and inaccessible.'" *Nix v. Williams*, 467 U.S. at 441, 81 L. Ed. 2d at 386 (emphasis added) (citation omitted).

With reference from *Silverthorne* to "[such facts]," which are to be "gained from an *independent source*," the Court in *Nix* quotes *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455 (1963), as to the emphasis of the Court in that case that evidence (including the indirect product or "fruit") illegally obtained need not always be suppressed, stating: "'We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light *but for the illegal actions* of the police.'" *Nix v. Williams*, 467 U.S. at 442, 81 L. Ed. 2d at 386. It is notable from these references that the Supreme Court from the outset, and in *Nix* itself, makes no distinction between primary and derivative evidence with respect to either its exclusion under the rule or its inclusion by way of an exception to the rule.

The Supreme Court in *Nix*, in further establishing its predicate, reviews historically the close kinship among the inevitable discovery doctrine, the independent source doctrine and the harmless error rule, particularly with respect to the fundamental reasoning, the essence of these parallel doctrines, which is that, in the search for truth in the administration of justice, the vital interests of society in deterring unlawful police conduct *and* in having juries receive all relevant and probative evidence of a crime "are properly balanced by putting the police in the same, not a *worse*, position tha[n] they would have been in if no police error or misconduct had occurred. . . . See *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 79, 12 L. Ed. 2d 678, 84 S. Ct. 1594 (1964); *Kastigar v. United States*, 406 U.S. 441, 457, 458-459, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972)." *Nix v. Williams*, 467 U.S. at 443, 81 L. Ed. 2d at 387.

The *Nix* opinion, in this context, sets forth by footnote the following:

**STATE v. GARNER**

[331 N.C. 491 (1992)]

> The ultimate or inevitable discovery exception to the exclu-
> sionary rule is closely related in purpose to the harmless-error
> rule of *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d
> 705, 87 S. Ct. 824, 24 ALR 3d 1065 (1967). The harmless-
> constitutional-error rule "serve[s] a very useful purpose insofar
> as [it] block[s] setting aside convictions for small errors or
> defects that have little, if any, likelihood of having changed
> the result of the trial." The purpose of the inevitable discovery
> rule is to block setting aside convictions that would have been
> obtained without police misconduct.

*Nix v. Williams*, 467 U.S. at 443 n.4, 81 L. Ed. 2d at 387 n.4.

Thus, the Supreme Court in *Nix* held: "If the prosecution can
establish by a preponderance of the evidence that the information
ultimately or inevitably would have been discovered by lawful means
. . . then the deterrence rationale has so little basis that the evidence
should be received. . . . Anything less would reject logic, experience,
and common sense." *Id.* at 444, 81 L. Ed. 2d at 387-88.

While defendant acknowledges that *Nix* dispels any doubt about
the existence of the inevitable discovery doctrine under federal
law, he nevertheless contends the trial court in the instant case
misapplied the doctrine by not requiring the State to prove an
ongoing independent investigation and by allowing inadequate proof
of inevitability.

The trial court, upon consideration of various approaches taken
by the circuit courts since the *Nix* decision, ruled that the require-
ment of proof of an ongoing independent investigation was not
supported by the better authorities. We concur. A careful reading
of *Nix* reveals that the Supreme Court imposed no requirement
upon the prosecution to prove an independent investigation was
under way at the time the tainted investigation was taking place.
*See United States v. Silvestri*, 787 F.2d 736 (1st Cir. 1986), *cert.
denied*, 487 U.S. 1233, 101 L. Ed. 2d 931 (1988). The Ninth Circuit
has applied the inevitable discovery exception without concern for
or requirement of any ongoing legal investigation. *United States
v. Merriweather*, 777 F.2d 503 (9th Cir. 1985). Further, in this
regard, in *United States v. Boatwright*, 822 F.2d 862 (9th Cir.
1987), Judge Kennedy (now Justice Kennedy), addressing both the
question of dual ongoing investigations and the variety of cir-
cumstances under which inevitable discovery may be established
and applied, stated for the Court:

STATE v. GARNER

[331 N.C. 491 (1992)]

There will be instances where, based on the historical facts, inevitability is demonstrated in such a compelling way that operation of the exclusionary rule is a mechanical and entirely unrealistic bar, preventing the trier of fact from learning what would have come to light in any case. In such cases, the inevitable discovery doctrine will permit introduction of the evidence, whether or not two independent investigations were in progress. The existence of two independent investigations at the time of discovery is not, therefore, a necessary predicate to the inevitable discovery exception.

*Boatwright*, 822 F.2d at 864.

In a thorough analysis of this question, comparing "no warrant" situations to cases where a warrant is obtained subsequent to an illegal search, and cases like *Nix* where no warrant is involved in any way, the First Circuit in *Silvestri* concluded that an "ongoing" investigation test is too inflexible and instead suggested "that the analysis focus on the questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented." *United States v. Silvestri*, 787 F.2d at 746. This clearly envisions a case-by-case approach, recognizing that the particular facts of any given case will determine whether, absent other means, proof of an ongoing, independent investigation is necessary to show inevitability. We consider this the more practical and correct approach in application of the doctrine, and we adopt this approach.

[2] With regard to defendant's challenge of the adequacy of the State's proof of inevitability, the Supreme Court in *Nix* held:

As to the quantum of proof, we have already established some relevant guidelines. In *United States v. Matlock*, 415 U.S. 164, 178, n.14, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974) . . ., we stated that "the controlling burden of proof at suppression hearings should impose *no greater burden* than proof by a preponderance of the evidence." . . . We are unwilling to impose added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barrier to placing evidence of unquestioned truth before juries.

*Nix v. Williams*, 467 U.S. at 444 n.5, 81 L. Ed. 2d at 388 n.5.

While the police first learned the identity of the gun merchant from the receipt found with the gun box pursuant to the search

of defendant's residence, the State's evidence showed, through the testimony of three law enforcement officers, that it was normal law enforcement procedure in Cumberland County to check the ATF and the PIN records to determine whether a recovered weapon was stolen, the location of its manufacture, the time and place of its sale by a gun merchant and its ownership if it does not "come up stolen." Specifically, according to the testimony of a Fayetteville Police Department investigator, had the pawnshop receipt not been found at defendant's residence, the serial number of the weapon seized during the permissive search where defendant was arrested would have been "run through" the PIN and the ATF records check.

Since it is clear from the record that Jim's Pawnshop did in fact file with the ATF (and keep copies of) the documentation required by federal law upon the sale of a firearm, it is manifest that an independent inquiry of the ATF would have produced the reference to Jim's Pawnshop. The defendant offered no evidence in this case. The State thus proved inevitable discovery by a preponderance of the evidence. We therefore conclude that the trial court's application of the inevitable discovery doctrine did not violate the defendant's Fourth Amendment rights.

[3] The defendant further contends, under this first issue, that the derivative evidence obtained directly from the pawnshop, regarding his ownership or purchase of the murder weapon in 1986, should have been suppressed because the exclusionary rule arising from Article I, Section 20 of the North Carolina Constitution does not and should not include an "inevitable discovery exception." While conceding that there is no provision in our State Constitution which explicitly calls for the exclusionary rule, the defendant contends the rule has been held by this Court to be "implied" in Article I, Section 20, citing State v. Arrington, 311 N.C. 633, 319 S.E.2d 254 (1984), and defendant further argues that the text of the State Constitution itself (Article I, Section 20) calls for "broader" protection than that of the Fourth Amendment.

This Court in Arrington refers to State v. Small, 293 N.C. 646, 239 S.E.2d 429 (1977); State v. Reams, 277 N.C. 391, 178 S.E.2d 65 (1970), cert. denied, 404 U.S. 840, 30 L. Ed. 2d 74 (1971); and State v. Colson, 274 N.C. 295, 163 S.E.2d 376 (1968), cert. denied, 393 U.S. 1087, 21 L. Ed. 2d 780 (1969) as "implying an exclusionary rule arising from Article I, Section 20," State v. Arrington, 311

N.C. at 644, 319 S.E.2d at 261; however, the holding of this Court in *Arrington* is as follows:

> [A]pplication of the totality of circumstances test leads us to hold that there was a substantial basis for the finding of probable cause in the present case. Therefore, we need not consider or decide whether the guarantees against unreasonable searches and seizures in Article 1, Section 20 of the Constitution of North Carolina require the exclusion of evidence seized under a search warrant not supported by probable cause.

*State v. Arrington*, 311 N.C. at 643, 319 S.E.2d at 261.

The evolution of the exclusionary rule in North Carolina is set forth in *State v. Colson*, 274 N.C. 295, 163 S.E.2d 376, wherein our Court stated that in derogation of the common law, the exclusionary rule was first laid down in *Weeks v. United States*, 232 U.S. 383, 58 L. Ed. 652 (1914), which held that evidence illegally seized by federal officers violated defendant's Fourth Amendment constitutional rights and was inadmissible, but that the Fourth Amendment reached only the federal government and evidence seized illegally by state or local officers continued to be admissible unless prohibited by state statute. The United States Supreme Court declined to extend the exclusionary rule adopted in *Weeks* to the states by the due process clause of the Fourteenth Amendment until its decision in *Mapp v. Ohio*, 367 U.S. 643, 6 L. Ed. 2d 1081 (1961). This decision held that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." *Id.* at 655, 6 L. Ed. 2d at 1090. Thus, in light of *Mapp* this Court stated in *Colson*: "Evidence unconstitutionally obtained is excluded in both state and federal courts as an essential to due process — not as a rule of evidence but as a matter of constitutional law." *State v. Colson*, 274 N.C. at 306, 163 S.E.2d at 384. The federal exclusionary rule adopted in *Weeks* became statutory law in North Carolina before *Mapp* by enactment in 1937 of N.C.G.S. § 15-27, later N.C.G.S. § 15-25 which was repealed in 1973. The current applicable statutory law is N.C.G.S. § 15A-974, which simply provides in relevant part that evidence seized in violation of the federal or state constitution must be suppressed. This Court, in its majority opinion in *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988) stated: "Our state constitution, like the Federal Constitution, re-

quires the exclusion of evidence obtained by unreasonable search and seizure." 322 N.C. at 712, 370 S.E.2d at 555.

Considering the precise wording of Article I, Section 20, we find no support for defendant's position that the "text" itself calls for "broader" protection than that of the Fourth Amendment. Article I, Section 20 is captioned "General warrants," and speaks solely to the prohibition of issuance of such warrants which allow officers "to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence . . . ." N.C. Const. art. I, § 20 (1984). While this Court has held that Article I, Section 20 of our Constitution, like the Fourth Amendment to the United States Constitution, prohibits unreasonable searches and seizures, *e.g.*, *State v. Arrington*, 311 N.C. 633, 319 S.E.2d 254; *State v. Ellington*, 284 N.C. 198, 200 S.E.2d 177 (1973), and requires the exclusion of evidence obtained by unreasonable search and seizure, *e.g.*, *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553, there is nothing to indicate anywhere in the text of Article I, Section 20 any enlargement or expansion of rights beyond those afforded in the Fourth Amendment as applied to the states by the Fourteenth Amendment. In terms of modern day jurisprudence and actual practice, it is abundantly clear that the language of this provision of our Constitution, relating entirely to "general warrants," of the past (while still relevant to protect against any recurrence of the historic abuses specified), should not be viewed as a vehicle for any inventive expansion of our law.

As Justice (now Chief Justice) Exum stated for the Court in *State v. Richards*, 294 N.C. 474, 242 S.E.2d 844 (1978):

> Our holding here . . . does not transform the warrant which authorized the search into a general warrant—a device . . . "abhorred since colonial days and banned by both the Federal and State Constitutions." Such warrants are banned, too, by the North Carolina Constitution, Art. I, § 20. The general warrant against which these constitutional provisions speak did not specify items to be searched for or persons to be arrested nor were they supported by showings of probable cause that any particular crime had been committed.

294 N.C. at 491-92, 844 S.E. 2d at 855 (citations omitted). We therefore hold the defendant's contention that Article I, Section 20 of our

STATE v. GARNER

[331 N.C. 491 (1992)]

Constitution should be read as an extension of rights beyond those afforded in the Fourth Amendment is misplaced.

[4] Next defendant contends that in the event this Court does adopt the inevitable discovery doctrine, the parameters for its application in North Carolina should be narrowly drawn in order to preserve the deterrence value of the exclusionary rule. In addition to arguing for the "clear and convincing evidence" standard and an "ongoing independent investigation" as to quantum of proof, both of which we have hereinabove rejected, the defendant argues that the State should be required to prove an absence of bad faith on the part of investigating officers. Relying primarily on this Court's majority opinion in *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553, which held there is no "good faith" exception to the exclusionary rule in North Carolina, under Article I, Section 20 of our Constitution, the defendant argues the trial court, in the interest of maintaining necessary minimal safeguards against intentional police misconduct, should have required the State to prove the absence of bad faith on the part of the investigating officers, instead of ruling as it did that the question of bad faith was irrelevant in the proper application of the inevitable discovery doctrine. We find this argument without merit and affirm the trial court.

The trial court in the instant case did not apply the inevitable discovery doctrine to any "primary evidence" seized from defendant's residence pursuant to the defective search warrant. Rather, the trial court suppressed the evidence it determined to have been illegally seized and applied the inevitable discovery doctrine only to the documentary evidence obtained directly from Jim's Pawnshop. This evidence was derivative, or secondary evidence which was the product of the primary evidence. In light of the clear lack of distinction between primary and derivative evidence as to either exclusion or inclusion under the *Nix* opinion, we hold that the trial court's suppression of the primary evidence was not necessary in its application of the doctrine. However, by so doing the trial court in this case unquestionably served the deterrence objective because any suppression by limiting application of the doctrine has its own deterrent effect. If the State finds itself in any situation where it must prove that the evidence inevitably would have been discovered by other legal, independent means, and it fails to do so, the doctrine is not applied and the evidence is suppressed. This risk of suppression inherently preserves the deterrence value

of the exclusionary rule. Further, if the State carries its burden and proves inevitable discovery by separate, independent means, thus leaving the State in no better and no worse position, any question of good faith, bad faith, mistake or inadvertence is simply irrelevant.

The ruling of the Supreme Court on this question and its underlying public policy basis, as set forth in *Nix*, is clear and compelling. The Court states:

> The requirement that the prosecution must prove the absence of bad faith, imposed here by the Court of Appeals, would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a *worse* position than they would have been in if no unlawful conduct had transpired. And, of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach.

*Nix v. Williams*, 467 U.S. at 445, 81 L. Ed. 2d at 388. We thus hold that the trial court correctly applied the doctrine under the *Nix* standard in declining to hear evidence, either from the defendant or the State, on the issue of bad faith.

The majority based its ruling in *Carter* on two grounds: (1) the deterrence value of the exclusionary rule and (2) "for the sake of maintaining the integrity of the judicial branch of government." *State v. Carter*, 322 N.C. at 719, 370 S.E.2d at 559. With regard to the great importance of maintaining the integrity of the judicial branch, we agree with the public policy basis set forth above by the Supreme Court in *Nix* and its further relevant ruling:

> Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial. . . . Suppression, in these circumstances, would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice.

*Nix v. Williams*, 467 U.S. at 446-47, 81 L. Ed. 2d at 389.

STATE v. GARNER

[331 N.C. 491 (1992)]

For the foregoing reasons, we find the positions asserted by defendant in his first issue to be without merit.

## II.

[5] The second issue raised by defendant on appeal is whether the trial court erred in allowing into evidence testimony regarding the defendant's attempted murder of William Jackson some three weeks after the murder for which he was tried in this case.

Clearly, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C.G.S. § 8C-1, Rule 404(b) (1988). Yet, "[w]here . . . such evidence reasonably tends to prove a material fact in issue in the crime charged, it will not be rejected merely because it incidentally proves the defendant guilty of another crime." *State v. Johnson*, 317 N.C. 417, 425, 347 S.E.2d 7, 12 (1986). Indeed, this Court has held that Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, . . . [committed] by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990).

Here, the evidence concerning the defendant's attempted murder of the taxicab driver three weeks later with the same gun tended to prove the defendant's possession and control of the weapon at a time close in proximity to that of the Harrelson murder. Therefore, although the evidence also showed the defendant to be guilty of another crime of violence, we cannot say that its only probative value was to show the defendant's murderous propensities. Thus, the evidence is admissible under Rule 404(b).

[6] The defendant next contends, as to this issue, that the trial court should have excluded the evidence under N.C.G.S. § 8C-1, Rule 403, because, on balance, its probative value was outweighed by its prejudicial effect. Certainly the evidence of defendant's attempt to commit another murder would have some prejudicial effect on the jury. However, we again agree with the State's assessment that evidence showing that a regular customer of the BTO store had possession of the weapon used to kill Ms. Harrelson three weeks after the murder was significantly inculpatory. Moreover, the testimony of the taxicab driver linked defendant more directly

to the murder weapon than any other evidence presented at trial. In light of all this, we cannot say that the trial court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice in this case. We therefore find

No error.

Justice FRYE concurring in result.

Today the Court adopts a rule which permits the admission of illegally seized evidence based upon a quantum of proof which I believe to be less than that required by our State Constitution. Accordingly, I cannot join in the Court's opinion; however, because I believe the Court reached the right result on the facts of this case, I concur in the result.

In *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988), this Court held the exclusionary rule of Article I, Section 20 of the North Carolina Constitution served two essential functions: (1) maintenance of the integrity of our judicial branch of government; and (2) maintenance of an effective institutional deterrence to police violation of the constitutional law of search and seizure. *Id.* at 722, 370 S.E.2d at 560. In my view, the Court today undermines these important principles by adopting a preponderance of the evidence standard for "inevitable discovery" cases. I believe an inevitable discovery exception to the exclusionary rule is constitutionally permissible only when the State can demonstrate inevitability by *clear and convincing* evidence.[1]

Article I, Section 20 of the North Carolina Constitution provides:

> *General Warrants.* General warrants, whereby an officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.

---

1. My concurrence is based exclusively on state constitutional grounds. Of course, I recognize that the United States Supreme Court, interpreting the Federal Constitution, has adopted a preponderance of the evidence standard for inevitable discovery cases. *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377 (1984).

N.C. Const. art. I, § 20. Although worded differently than the Fourth Amendment of the United States Constitution, Article I, Section 20, like its federal counterpart, prohibits unreasonable searches and seizures. *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984). Furthermore, it is now settled that Article I, Section 20, like its federal counterpart, requires the exclusion of evidence obtained by unreasonable search and seizure. *Carter*, 322 N.C. at 712, 725, 370 S.E.2d at 555, 562 (although *Carter* was a 4-3 decision, justices were unanimous on this point); *State v. Small*, 293 N.C. 646, 656, 239 S.E.2d 429, 436 (1977); *State v. Reams*, 277 N.C. 391, 395, 178 S.E.2d 65, 67 (1970), *cert. denied*, 404 U.S. 840, 30 L. Ed. 2d 74 (1971).

Although Article I, Section 20 and the Fourth Amendment protect the same fundamental right to be free from unreasonable searches and seizures, "[w]hether rights guaranteed by the Constitution of North Carolina have been provided and the proper tests to be used in resolving such issues are questions which can only be addressed with finality by this Court." *Arrington*, 311 N.C. at 643, 319 S.E.2d at 260; *see also Carter*, 322 N.C. at 713, 370 S.E.2d at 562 (this Court has the authority to interpret our own Constitution differently than the Federal Constitution as long as our citizens are accorded no lesser rights than guaranteed by a parallel federal provision). Thus, even though this Court may choose to adopt federal standards when interpreting Article I, Section 20, this Court has not hesitated to part ways with the federal judiciary when our State Constitution so requires. For example, in *Carter*, this Court held that there was no "good faith" exception to the exclusionary rule under the North Carolina Constitution, rejecting the lead of the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677 (1984), which recognized such an exception under the Fourth Amendment.

In *Carter*, this Court reviewed in detail the history and importance of the exclusionary rule in North Carolina, noting that the rule was first recognized in this state by legislative enactment in 1937. *See generally Carter*, 322 N.C. 709, 370 S.E.2d 553. Thus, for more than half a century, "the expressed public policy of North Carolina has been to exclude evidence obtained in violation of constitutional rights against unreasonable searches and seizures." *Id.* at 719, 370 S.E.2d at 559. Speaking for the Court in *Carter*, Justice Martin explained the crucial and central role the exclusionary rule

plays in fulfilling our state constitutional prohibition against unreasonable searches and seizures:

> The exclusionary sanction is indispensable to give effect to the constitutional principles prohibiting unreasonable search and seizure. We are persuaded that the exclusionary rule is the only effective bulwark against governmental disregard for constitutionally protected privacy rights. Equally of importance in our reasoning, we adhere to the rule for the sake of maintaining the integrity of the judicial branch of government.

> The preservation of the right to be protected from unreasonable search and seizure guaranteed by our state constitution demands that the courts of this state not condone violations thereof by admitting the fruits of illegal searches into evidence. . . .

> . . . .

> In determining the value of the exclusionary rule, we regard the crucial matter of the integrity of the judiciary and the maintenance of an effective institutional deterrence to police violation of the constitutional law of search and seizure to be the paramount considerations. We do not discount the implications of the failure to convict the guilty because probative evidence has been excluded in even one grave criminal case. The resulting injuries to victim, family, and society are tolerable not because they are slight but because the constitutional values thereby safeguarded are so precious.

*Id.* at at 719-722, 370 S.E.2d at 559-60.

The inevitable discovery exception to the exclusionary rule, as recognized by the Court today, is a first cousin to the independent source exception, first recognized by the United States Supreme Court in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 64 L. Ed. 319 (1920). Under the independent source exception, evidence which has *actually been obtained* through constitutional means can be introduced at trial even though that *same evidence* has also been obtained through unconstitutional means. As this Court explained in *State v. Phifer*, 297 N.C. 216, 254 S.E.2d 586 (1979): "Since the evidence sought to be suppressed *was obtained* through lawful means unrelated to the invalid inventory search, it follows that the 'fruit of the poisonous tree' doctrine has no application to this case." *Id.* at 226, 254 S.E.2d at 591 (emphasis added).

As recognized by Justice Brennan in his dissent in *Nix*, there is one crucial distinction between the independent source exception and the inevitable discovery exception:

> When properly applied, the "independent source" exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means. It therefore does no violence to the constitutional protections that the exclusionary rule is meant to enforce. The "inevitable discovery" exception is likewise compatible with the Constitution, though it differs in one key respect from its next of kin: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if independent investigations were allowed to proceed.

*Nix*, 467 U.S. at 459, 81 L. Ed. 2d at 397 (Brennan, J., dissenting). The inevitable discovery exception "necessarily implicates a hypothetical finding that differs in kind from the factual finding that precedes application of the independent source rule." *Id.*, 81 L. Ed. 2d at 397-98. Thus, concluded Justice Brennan, in order to "protect fully the fundamental rights served by the exclusionary rule, I would require clear and convincing evidence before concluding that the government had met its burden of proof on this issue." *Id.*, 81 L. Ed. 2d at 398. Although Justice Brennan's argument did not carry the day in *Nix*, I find his reasoning persuasive, especially in light of this Court's past reluctance to eviscerate the exclusionary rule. *See Carter*, 322 N.C. 709, 370 S.E.2d 553.

To allow the admission of illegally seized evidence under the preponderance of the evidence standard undermines the importance of our state constitutional prohibition against unreasonable searches and seizures. The preponderance of the evidence standard, also known as the greater weight of the evidence standard, is the ordinary standard for civil cases. 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 212 (3d ed. 1988). To meet this burden, the State is only required to demonstrate that it is *more likely than not* that the illegally seized evidence would have been inevitably discovered by independent means.[2] *See id.* Given this low

---

2. Inevitable means "unable to be avoided, evaded, or escaped; certain; necessary." *Random House Webster's College Dictionary* 688 (1991). It thus seems inconsistent to ask whether it is "more likely than not" that evidence would have been "inevitably" discovered.

STATE v. GARNER

[331 N.C. 491 (1992)]

standard, and the natural temptation to utilize this newly recognized exception, I fear that the exclusionary rule may no longer be able to fulfill its twin objectives of maintaining the integrity of our judicial system, and acting as an effective deterrent to police misconduct. Only by requiring a heightened burden of proof can we ensure that the exclusionary rule will continue to serve its historic function of protecting the people of North Carolina from unreasonable searches and seizures. I would therefore require clear and convincing evidence that illegally seized evidence would have been discovered by constitutional means before concluding that the State has met its burden of proof. In the words of the exception, would the same evidence have been "inevitably discovered?"

On the facts of this case, the State may very well be able to prove by clear and convincing evidence that the illegally obtained information would have been inevitably discovered. However, it is not necessary to reach this question because, on the facts of this case, the introduction of the evidence at issue was clearly harmless beyond a reasonable doubt. See N.C.G.S. § 1443(b) (1988).

As noted by the Court, the State's firearm identification expert positively identified the bullet removed from the victim and the bullet removed from cab driver William Jackson's body as having been fired from the pistol legally seized from defendant's coat at the time of his arrest. In addition, Brad Dickens testified that defendant confessed the murder to him. Dickens also testified that he had seen defendant on more than one occasion prior to the murder in possession of the murder weapon. The disputed evidence in this case was admitted to prove that defendant had purchased the murder weapon from Jim's Pawn Shop some two years prior to the murder. This evidence was not crucial to the State's case. Given that (1) the murder weapon was legally seized from defendant's coat at the time of his arrest, (2) the murder weapon was seen in defendant's possession prior to the murder, and (3) defendant confessed his crime to Dickens, I believe the State has met its burden of proving harmlessness beyond a reasonable doubt.

For the reasons stated above, I join in the Court's result.

Chief Justice EXUM joins in this concurring opinion.