STATE OF NORTH CAROLINA v. TYRONE LAMONT DEAN

No. COA08-344

(Filed 7 April 2009)

**1. Criminal Law— disruptive spectators—removal**

Defendant was not entitled to a new trial for first-degree murder because the judge removed four spectators from the courtroom where the jurors had heard testimony about gang involvement and that one of the spectators was a codefendant; the judge was informed by a bailiff that jurors were concerned for their safety; the judge knew that jurors during the first trial (which ended in a hung jury) had been intimidated and afraid, in part because of the presence and conduct of people in the gallery; and the trial judge specifically found that the spectators who were removed were talking in the courtroom in violation of his pretrial order and that they did not follow the orders of the court.

**2. Evidence— prior crimes or bad acts—admissibility**

The trial court did not abuse its discretion in a first-degree murder prosecution by admitting evidence that defendant had earlier shot another victim with the same gun where the evidence was relevant to defendant's identity and its probative value was significant.

**3. Evidence— objectionable—other evidence of guilt—no plain error**

There was no plain error in a first-degree murder prosecution where there was no question that some of the evidence at trial was objectionable but was not the only evidence that tended to show that defendant was guilty of first-degree murder. The challenged evidence did not tilt the scales and cause the jury to reach its verdict.

**4. Criminal Law— prosecutor's closing argument—brevity of challenged remarks—context—no intervention ex mero motu**

The trial court did not abuse its discretion in a first-degree murder prosecution by failing to intervene in the State's closing argument, considering both the relative brevity of the allegedly improper arguments and the context.

Judge GEER concurring in part and concurring in the result only in part.

STATE v. DEAN

[196 N.C. App. 180 (2009)]

Appeal by Defendant from judgment entered 30 July 2007 by Judge J.B. Allen, Jr., in Durham County Superior Court. Heard in the Court of Appeals 11 September 2008.

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Daniel R. Pollitt, for Defendant.*

STEPHENS, Judge.

The facts of this case are easily stated but hardly understood. Around 2:00 a.m. on 6 May 2004, twenty-two-year-old Reginald Johnson was outside an apartment complex on Weaver Street in Durham, where he lived with his mother. Nineteen-year-old Tyrone Lamont Dean ("Defendant") and five other men, all of whom were members of the "Eight-Trey Crips" gang, were outside the apartment complex selling cocaine. The men mistook Reginald Johnson for a leader of a rival gang, the "Bloods." According to one of the men who was with Defendant that night, the Crips "just ran down and started shooting." Reginald Johnson was struck and killed by the gunfire.

The Durham County Grand Jury indicted Defendant on 16 August 2004 for first-degree murder. The case was called for trial in February 2007, Judge Orlando F. Hudson presiding. On 6 March 2007, Judge Hudson declared a mistrial after the jury was unable to reach a unanimous verdict. The case was again called for trial in July 2007, Judge J.B. Allen, Jr., presiding. Defendant did not present any evidence in his defense, and the jury convicted Defendant of first-degree murder. Judge Allen sentenced Defendant to life imprisonment without parole. Defendant appeals.

## STATE'S EVIDENCE

Anjelica "Jelly" Johnson, who was not related to Reginald Johnson ("Reginald"), testified that she was outside the Weaver Street apartment complex on the night Reginald was killed. Jelly testified that she saw a group of men run toward Reginald, heard gunshots, and saw Reginald get hit by a bullet. Jelly, herself a member of the Crips gang, testified that she recognized Defendant as one of the men who ran toward Reginald and that Defendant was the only man she recognized. Jelly's testimony was contradicted by three prior statements. In a statement Jelly wrote and signed the same day of the shooting, she did not identify Defendant as one of the men she saw

that night. About three weeks after the shooting, Jelly saw a newspaper story about the shooting which included pictures of Defendant and another man, Mario Fortune. After seeing the story, Jelly identified Mario Fortune from a photo lineup as the man she saw on 6 May 2004. At another point after the shooting, Jelly told a police officer that she was "100 percent sure" that the shooter was DeMario Boyd. Jelly acknowledged at trial that, prior to 2007, she never told anyone that she saw Defendant on the night of the shooting.

Anthony Douglas testified that he walked past Jelly and Reginald on his way home on the night of the shooting. Douglas testified that he saw shots being fired and that Defendant was one of the people shooting. Douglas' trial testimony was contradicted by two prior statements. In a statement Douglas signed the same day as the shooting, Douglas identified another man as the only person he recognized and did not identify Defendant as one of the shooters. In a second statement written and signed by Douglas soon after the shooting, Douglas did not identify Defendant as one of the shooters. At the time he gave the second statement, Douglas was not on probation and did not have any criminal charges pending against him. At the time of trial, Douglas was incarcerated and serving 28-43 months in prison, having pled guilty to conspiracy to commit armed robbery and two felony assault charges. Douglas testified that his decision to testify against Defendant was not part of his plea agreement.

Phillipe Parker testified that he was one of the men with Defendant on Weaver Street on the night of the shooting. Parker testified that he and all of the men with him were members of the Crips gang. Parker testified that on 5 May 2004 he was with Defendant, Deshawn Mitchell, Mario Fortune, Joshua "Juicie" Johnson, and Jeffrey Allen at a duplex on Holloway Street in Durham smoking marijuana. The six men went to an apartment near Weaver Street, continued smoking marijuana, then went outside to sell cocaine. According to Parker, he was the only one of the six who was unarmed that night. Defendant had a .38 caliber weapon. The men saw Reginald, mistook him for a rival gang leader, and "just ran down and started shooting." Parker testified that he saw Defendant, Mitchell, and Juicie fire their guns at Reginald. After the shooting, Parker testified, the men went back to the Holloway Street duplex to smoke marijuana.

Parker further testified that he was arrested on 19 May 2004, along with Defendant, Fortune, and Juicie, at the Holloway Street duplex. Parker testified that at the time of his arrest he was served with a warrant for an unrelated murder and that he had five other

felony charges pending against him. Parker pled guilty to the five felony charges in August 2004 and received a probationary sentence. Parker was incarcerated for two years for his involvement in the unrelated murder, but was never charged for his involvement in Reginald's murder. Parker acknowledged that he got a "[p]retty good deal[.]"

Durham Police Department Sergeant Jack Cates testified that he participated in the 19 May 2004 arrest at the Holloway Street duplex. During the arrest, Cates testified, police officers discovered a .38 caliber handgun which Parker later identified as the gun used by Defendant on 6 May 2004. Cates testified that the gun was submitted to the State Bureau of Investigation for Integrated Ballistics Identification System ("IBIS") testing. The IBIS testing revealed that the gun had been used in five other incidents in Durham: an aggravated assault on 4 May 2004, two aggravated assaults on 22 April 2004, an aggravated assault on 24 June 2003, and a vehicle shooting on 20 March 2003. Cates never testified that Defendant was involved in either the April 2004 or the 2003 incidents. Cates acknowledged on cross-examination that it was "exceptionally clear"[1] that Willie Hopps committed one of the 22 April 2004 assaults and that Shamera Barbie committed the 24 June 2003 assault. During Cates' testimony, the State introduced, without objection from Defendant, a poster-size street map of Durham showing the locations of all of the prior incidents, the location of the Holloway Street duplex, and the location of the shooting on Weaver Street. While Cates testified that he "did not make any formal deals" with Parker, he acknowledged that Parker "did get a good break."

Crime scene technician Mark Bradford testified that he responded to the scene of the Weaver Street shooting on 6 May 2004. Bradford testified that he collected three different caliber shell casings at the scene, including two .38 caliber casings.

Crime scene investigator Eric Campen testified that he participated in the search of the Holloway Street duplex where he collected the following items: a .38 caliber handgun; an ammunition box containing seventeen .38 caliber bullets; a "yellow piece of paper with gang graffiti"; a "white piece of paper containing gang graffiti"; and a composition notebook. Campen examined the gun, ammunition box, and bullets for fingerprints. Campen lifted one fingerprint from the

---

1. Cates testified that "[e]xceptionally clear is when you have a suspect but the witnesses are—they refuse to cooperate and you have enough that you can proceed with charging the person, but however no one will testify."

box and one fingerprint from one of the bullets inside the box. Campen testified that the lifted fingerprints matched fingerprints contained on an ink fingerprint card "assigned" to Defendant.

Cletus Paylor, fingerprint liaison officer for Durham County, testified that he collected Defendant's fingerprints on the ink fingerprint card used by Campen to identify the fingerprints he found on the ammunition box and bullet. Paylor testified that Defendant was a "detainee" on 12 March 2002 when he "rolled" Defendant's prints. The ink fingerprint card listed Defendant's name and stated that he was charged with possession of a schedule II controlled substance. The State introduced the card created by Paylor into evidence without objection from Defendant and without redacting any of the information contained on the card.

Durham Police Department Detective Anthony Smith testified that he participated in the 19 May 2004 search of the Holloway Street duplex. Smith then testified extensively about gang culture in general and the specific meanings of graffiti contained on the papers collected by Campen at the duplex. Smith stated, "There's no way to know exactly who wrote this graffiti, other than the fact that the individuals that I came into contact with in this residence are Crips."

Harvey Jones testified that he was at an apartment on Liberty Street in Durham on the afternoon of 4 May 2004 when Defendant "busted in the door[]" with a silver handgun and told Jones to "give it up." Jones testified that Defendant shot him in the neck, took his money, and "ran on out the door." Jones acknowledged on cross-examination that he spent ten years in prison on "a murder charge[.]"

Crime scene technician Rebecca Reid testified that she responded to the shooting at the apartment on Liberty Street and collected a .38 caliber shell casing from the apartment.

Special Agent Adam Tanner of the State Bureau of Investigation testified that the shell casing collected by Reid at the apartment on Liberty Street and the .38 caliber shell casings collected by Bradford at the scene of the shooting on Weaver Street were all fired from the handgun collected by Campen at the Holloway Street duplex. Tanner also testified that the bullet identified by a medical examiner as having caused Reginald's death was fired from a nine millimeter handgun.

**STATE v. DEAN**

[196 N.C. App. 180 (2009)]

## ISSUES

Defendant presents seven issues for our review. He contends he is entitled to a new trial because: (1) Judge Allen erroneously banished four spectators from the courtroom during the trial; (2) the admission of the poster-size street map of Durham amounts to plain error; (3) the trial court erred in admitting Jones' testimony concerning the 4 May 2004 assault; (4) the admission of the fingerprint card created by Paylor amounts to plain error; (5) Parker's testimony that Defendant used and sold drugs on the night of the shooting amounts to plain error; (6) the admission of the papers collected by Campen at the duplex and Smith's testimony concerning gang beliefs in general and gang graffiti contained on the papers amounts to plain error; and (7) the prosecutor made several improper closing arguments.

## ANALYSIS

### 1. REMOVAL OF COURTROOM SPECTATORS

[1] Defendant argues that he is entitled to a new trial because Judge Allen erroneously removed four spectators from the courtroom during the second trial. Before the jury was selected in that trial, the prosecutor expressed concerns about "courtroom security" to Judge Allen. According to the prosecutor, several members of the jury in the first trial sent notes expressing concerns for their safety to Judge Hudson. The prosecutor also advised Judge Allen that courtroom spectators had used cell phone cameras during the first trial. The prosecutor asked Judge Allen to enter an order banning the use of cell phones in the courtroom and asked Judge Allen to instruct the bailiffs to "be on the lookout" for "gang signs[.]" In response to the State's request, Judge Allen posted the following written order on the door of the courtroom:

NO CELL PHONES SHALL BE ALLOWED IN COURTROOM;

NO TALKING WHILE COURT IS IN SESSION;

MUST HAVE SEAT AND REMAIN SEATED UNTIL RECESS, ANYONE LEAVING WHILE COURT IS IN SESSION WILL NOT BE ALLOWED BACK IN FOR THE DURATION OF THE TRIAL;

NO CONTACT WITH ANY JURORS AND NO CLOSE PROXIMITY TO ANY JURORS;

ANYONE ENTERING SUBJECT TO SEARCH BY BALIFF [sic].

**Any violations will be subject to contempt of court.**

The jury was selected, opening statements were given, and court adjourned for the day.

The next day, during the State's direct examination, Parker testified that Mitchell was one of the three men he saw fire a gun at Reginald Johnson. Parker then testified as follows:

Q  Mitchell, okay. And do you see him in the courtroom today?

A  Yeah.

Q  Where is he?

A  Right over there.

Q  Is he in the back with the white t-shirt?

A  Yeah.

Judge Allen adjourned court for the day before the State concluded examining Parker. In the middle of the State's examination the next day, Judge Allen excused the jurors from the courtroom and ordered one of the bailiffs to be sworn and examined. The bailiff testified as follows:

Q  Did juror number five make a comment to you just now as he come [sic] back in?

A  Yes, sir.

Q  And what did he tell you?

A  He said the jurors were talking amongst one another about the presence of what they thought were gang members in the courtroom and they were getting nervous.

Judge Allen then ordered Mitchell and three other men to approach.[2] One of the men stated that he was "[j]ust listening[]" to the proceedings. Two of the other men stated that they were Defendant's friends, and one of those men stated that he was Mitchell's "first cousin." Mitchell acknowledged that he was a "co-defendant" in the case. Judge Allen ordered all four men to leave the courtroom and not to return during the remainder of the proceedings, then stated as follows:

All right, I want to put on the record that the court took drastic measures here. That it had been reported to this court that

---

2. Although not entirely clear from the transcript, all four of the men were apparently sitting together "on the back row[.]"

when this case was tried back in February 2007 with the Honorable Orlando Hudson and the court has read numerous notes from jurors indicating that they were intimidated or appeared to be intimidated and were scared and afraid, and that that was a hung jury.

Now this jury here has now indicated that the jury is concerned about "gangs in Durham County" and the court has taken this action in [sic] ensure that the State of North Carolina receive[s] a fair trial and also to ensure that the defendant receive[s] a fair and impartial trial.

The jury returned to the courtroom, the State concluded its direct examination of Parker, and Defendant conducted a thorough cross-examination. Judge Allen then ordered the morning recess. At the conclusion of the morning recess, before the jury returned to the courtroom, defense counsel stated as follows:

On behalf of [Defendant] he wanted to state an objection to the court excusing his friends and family support, or his friends and support from the courtroom. And he wanted me to note that objection. Absent any findings that they done [sic] anything wrong they was [sic] excluded from the courtroom and they [sic] wanted them there for his support.

Judge Allen then read from six notes passed to Judge Hudson from jurors during the first trial and made more extensive findings concerning his earlier action. In at least three of the notes, jurors expressed concerns for their personal safety due to the presence and behavior of courtroom spectators. As for findings, Judge Allen stated as follows:

And the court was made aware of the concerns of the jury in the first trial. The court has noted that the young men that were asked to leave did not follow the orders of the court. They did not come in here and [sic] start. And some of them got up and left. They were talking in the courtroom. They were all dressed alike in white shirts. And one of the jurors on this jury . . . has already informed the court that this jury appears to have become intimidated by gangs here in Durham.

Judge Allen stated that he was "taking a position that it is necessary for this court to act in its discretion in order that both the State of North Carolina and the defendant receive a fair and impartial trial." The State called its next witness and the trial resumed.

Defendant contends on appeal that the removal of the four spectators violated N.C. Gen. Stat. § 15A-1033 and Defendant's constitutional rights "to open courts, public trial, law of the land, and due process of law under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 18 and 24 of the N.C. Constitution." Defendant argues (1) there was no evidence the spectators' conduct disrupted the trial or violated a courtroom security order, and (2) the trial court made inadequate findings of fact to support the removal. In response, the State argues (1) Defendant did not timely object to the trial court's action and has therefore waived appellate review of this issue, (2) even if Defendant's objection was timely, Defendant did not present any constitutional arguments to the trial court and has therefore waived review of such claims, and (3) the trial court did not abuse its discretion in ordering the spectators removed.

First, we think there is some merit to the State's contention that the objection Defendant presented to the trial court was not timely. "[A] party's failure to properly preserve an issue for appellate review ordinarily justifies the appellate court's refusal to consider the issue on appeal." *Dogwood Dev. and Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 195-96, 657 S.E.2d 361, 364 (2008). However, we elect not to resolve this issue on that ground and proceed as if the objection were timely.

Second, we agree with the State that Defendant never presented any constitutional arguments to the trial court, and we will not address such arguments for the first time on appeal. *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003) ("It is well settled that an error, even one of constitutional magnitude, that defendant does not bring to the trial court's attention is waived and will not be considered on appeal."); *State v. Garcia*, 358 N.C. 382, 410, 597 S.E.2d 724, 745 (2004) ("It is well settled that constitutional matters that are not 'raised and passed upon' at trial will not be reviewed for the first time on appeal.") (quoting *State v. Watts*, 357 N.C. 366, 372, 584 S.E.2d 740, 745 (2003), *cert. denied*, 541 U.S. 944, 158 L. Ed. 2d 370, (2004)), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005). Defendant's objection was premised only on his contention that there were no findings that the spectators did "anything wrong[.]"

Third, we disagree with Defendant's contention that a trial court *must* make findings of fact to support an order removing from the courtroom spectators whose conduct disrupts a trial. Although a trial court "must . . . [e]nter in the record the reasons" for removing a

*defendant* whose conduct is "so disruptive that the trial cannot pro-
ceed in an orderly manner[,]" N.C. Gen. Stat. § 15A-1032 (2003),
Section 15A-1033 imposes no such requirement. Moreover, the only
case Defendant cites in support of his contention, *State v. Jenkins*,
115 N.C. App. 520, 445 S.E.2d 622, *disc. review denied*, 337 N.C. 804,
449 S.E.2d 753 (1994), is clearly distinguishable. The defendant in that
case was on trial for raping a student at North Carolina Central
University. Pursuant to N.C. Gen. Stat. § 15-166, the trial court re-
moved everyone except "counsel, defendant, court personnel, and
members of the press" from the courtroom during the student's testi-
mony. *Id.* at 525, 445 S.E.2d at 625. *See* N.C. Gen. Stat. § 15-166 (2007)
("In the trial of cases for rape or sex offense or attempt to commit
rape or attempt to commit a sex offense, the trial judge may, during
the taking of the testimony of the prosecutrix, exclude from the
courtroom all persons except the officers of the court, the defendant
and those engaged in the trial of the case."). "[T]he trial court made
no findings of fact to support the closure during the student's testi-
mony." *Jenkins*, 115 N.C. App. at 525, 445 S.E.2d at 625. We granted a
new trial, stating that

> [i]n clearing the courtroom, the trial court must determine if
> the party seeking closure has advanced an overriding interest that
> is likely to be prejudiced, order closure no broader than neces-
> sary to protect that interest, consider reasonable alternatives
> to closing the procedure, and make findings adequate to sup-
> port the closure. *Waller v. Georgia*, 467 U.S. 39, 48, 81 L. Ed. 2d
> 31, 39 (1984).

*Id. Jenkins* does not support Defendant's contention that a trial court
must make findings of fact before removing disruptive spectators
from the courtroom.

Finally, we conclude that the removal of the spectators does not
entitle Defendant to a new trial. "[A] transcript is an imperfect tool
for conceptualizing the events of a trial." *State v. Lasiter*, 361 N.C.
299, 305, 643 S.E.2d 909, 912 (2007). "In the conduct of jury trials,
much must necessarily be left to the judgment and good sense of
the judge who presides over them . . . ." *State v. Laxton*, 78 N.C. 564,
570 (1878), *cited in State v. Paige*, 316 N.C. 630, 343 S.E.2d 848
(1986). A judge may remove any person other than a defendant
from the courtroom when that person's conduct disrupts the conduct
of the trial. N.C. Gen. Stat. § 15A-1033 (2003). *See also* N.C. Gen.
Stat. § 15A-1034(a) (2003) ("The presiding judge may impose reason-
able limitations on access to the courtroom when necessary to en-

STATE v. DEAN

[196 N.C. App. 180 (2009)]

sure the orderliness of courtroom proceedings or the safety of persons present.").

We discern no abuse of discretion in Judge Allen's removal of the spectators from the courtroom. At the time Mitchell, his cousin, and the two other men were removed from the courtroom, the jurors had heard testimony that Mitchell was a co-defendant in the case and had fired shots at Reginald Johnson, and the jurors were aware that Mitchell was present in the courtroom. Judge Allen was informed by a bailiff that jurors were concerned for their safety. Judge Allen knew that jurors during the first trial were intimidated and afraid, and that at least some of those feelings were engendered by the presence and conduct of people in the gallery. Moreover, Judge Allen specifically found that the men "were talking in the courtroom" in violation of his pre-trial order and that the men "did not follow the orders of the court." Under these circumstances, we defer to Judge Allen's judgment and good sense and conclude that Defendant is not entitled to a new trial on this issue.

## 2. MAY 4 ASSAULT

[2] Defendant argues that the trial court erred in admitting Jones' testimony concerning the 4 May 2004 assault. Pre-trial, Defendant filed a motion *in limine* to exclude Jones' testimony under Rules 403, 404(a), and 404(b) of the Rules of Evidence. The trial court deferred ruling on the motion until trial. Immediately before Jones testified, the court conducted a *voir dire* hearing on Defendant's motion. At the conclusion of *voir dire*, defense counsel argued that Jones' testimony should be excluded under the Rules of Evidence. The State responded that Jones' testimony was "a major identity piece of evidence" because subsequent evidence would show that a shell casing recovered from the scene of the assault on Jones was fired from the same gun which left casings at the scene of Reginald Johnson's murder. The trial court ruled that Jones' testimony was relevant and admissible under Rules 401, 402, and 404(b), and that the testimony should not be excluded under Rule 403.

Initially, although Defendant argues in his brief that Jones' testimony was "irrelevant and inadmissible under Evidence Rules 401-404 and the Fourteenth Amendment[,]" Defendant made no constitutional argument to the trial court. Additionally, other than this passing reference to the Fourteenth Amendment, Defendant does not assert constitutional error in his brief. Accordingly, we do not review the trial court's ruling for constitutional error. *Wiley*, 355 N.C. at 615, 565 S.E.2d at 39.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2003).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2003). Rule 404(b) is a rule of inclusion, "subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Where evidence of other crimes, wrongs, or acts is relevant to an issue other than the defendant's propensity to commit the charged offense, "the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403." *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988); *State v. Stevenson*, 169 N.C. App. 797, 800, 611 S.E.2d 206, 209 (2005). " 'Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court . . . . Evidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree.' " *State v. Agee*, 326 N.C. 542, 550, 391 S.E.2d 171, 176 (1990) (quoting *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56).

Jones' testimony was relevant to show Defendant's identity as the perpetrator of Reginald Johnson's murder. Special Agent Tanner testified that a shell casing recovered from the scene of the assault on Jones was fired from the same gun which ejected shell casings at the scene of Reginald Johnson's murder. Jones' testimony, in turn, tended to show that Defendant was in possession and control of that gun less than forty-eight hours before the murder. We conclude that Jones' testimony was admissible under Rule 404(b).

We also discern no abuse of discretion in the trial court's determination that the dangers of unfair prejudice, confusion of the issues, or misleading the jury did not substantially outweigh the probative

value of Jones' testimony. In showing that Defendant was in possession of and fired a gun that was used at the scene of Reginald Johnson's murder less than forty-eight hours before the murder, the probative value of Jones' testimony was significant. Defendant does not contend that the evidence's probative value was at all diminished because of the incidents' temporal proximity. Rather, Defendant contends that the evidence's probative value was diminished because of the incidents' dissimilarity. We disagree.

The Supreme Court addressed a similar issue in *State v. Garner*, 331 N.C. 491, 417 S.E.2d 502 (1992).

> In that case the defendant was tried for armed robbery and first-degree murder of Eva Harrelson. The State sought to admit evidence showing the defendant had attempted to murder a taxicab driver three weeks after the murder of Harrelson. Evidence revealed that on both occasions the assailant had used the same gun. The Court found no error in the admission of the evidence, holding that "the evidence concerning the defendant's attempted murder of the taxicab driver three weeks later with the same gun tended to prove the defendant's possession and control of the weapon at a time close in proximity to that of the Harrelson murder."

*State v. Abraham*, 338 N.C. 315, 337, 451 S.E.2d 131, 142 (1994) (quoting *Garner*, 331 N.C. at 509, 417 S.E.2d at 512). In the case at bar, Jones' testimony tended to show that Defendant shot Jones with the same gun used at the scene of Reginald Johnson's murder. We conclude that the trial court did not abuse its discretion in admitting Jones' testimony.

### 3. PLAIN ERROR

[3] Next, we address Defendant's arguments concerning plain error. Defendant argues that his trial was infected with plain error by the admission of the following evidence: (1) the poster-size map showing the results of the IBIS test, (2) the fingerprint card which showed that Defendant had been previously detained for possessing a controlled substance, (3) Parker's testimony that Defendant sold and used drugs on 6 May 2004, and (4) Smith's testimony generally concerning gang beliefs and culture, and specifically concerning gang graffiti found on papers at the Holloway Street duplex. We conclude that most, if not all, of this evidence was objectionable at trial; however, we also conclude that the introduction of this evidence did not result in a miscarriage of justice entitling Defendant to a new trial.

## A. Standard of Review

Our Supreme Court has adopted the plain error rule in criminal cases to temper the "potential harshness" of a rigid application of Rules 10(b)(1) and (2) of the Rules of Appellate Procedure, which require a defendant to have presented an objection to the trial court in order to preserve certain issues for appellate review. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983); *State v. Black*, 308 N.C. 736, 740-41, 303 S.E.2d 804, 806-07 (1983). "[T]he term 'plain error' does not simply mean obvious or apparent error, but rather has the meaning given it by the [Fourth Circuit] in [*United States v. McCaskill*, 676 F.2d 995 (4th Cir. 1982), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982))]." *Odom*, 307 N.C. at 660, 300 S.E.2d at 378.

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*McCaskill*, 676 F.2d at 1002 (footnotes omitted).

> Before deciding that an error by the trial court amounts to "plain error," the appellate court must be convinced that absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C.G.S. § 15A-1443 upon defendants who have preserved their rights by timely objection. This is so in part at least because the defendant could have prevented any error by making a timely objection.

*State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83-84 (1986) (citations omitted).

" '[P]lain error analysis applies only to instructions to the jury and evidentiary matters.' " *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000) (quoting *State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000)), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). Before applying plain error analysis to jury instructions, "it is necessary to determine whether the instruction complained of constitutes error." *State v. Cummings*, 361 N.C. 438, 470, 648 S.E.2d 788, 807 (2007), *cert. denied*, —— U.S. ——, 170 L. Ed. 2d 760 (2008). Before applying plain error analysis to evidentiary matters, it is necessary to determine whether the evidence was "objectionable[.]" *Black*, 308 N.C. at 741, 303 S.E.2d at 807. In other words, a defendant must show that he "could have prevailed on an objection" had one been made. *State v. Lawson*, 159 N.C. App. 534, 540, 583 S.E.2d 354, 358 (2003). *But see State v. Spencer*, 192 N.C. App. 143, 152, 664 S.E.2d 601, 607 (2008) ("A prerequisite to our engaging in a 'plain error' analysis is the determination that the [evidentiary admission] complained of constitutes 'error' at all.") (quoting *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468, *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986)). Finally, the plain error rule may not be applied on a cumulative basis, but rather a defendant must show that each individual error rises to the level of plain error. *State v. Holbrook*, 137 N.C. App. 766, 769, 529 S.E.2d 510, 512 (2000).

## B. Analysis

There is no question but that some of the evidence that Defendant now contends amounts to plain error was objectionable at trial. The inclusion of four of the prior assaults on the poster-size map was, at best, of questionable relevance. *State v. Haskins*, 104 N.C. App. 675, 679, 411 S.E.2d 376, 380 (1991) (stating that evidence of "other crimes, wrongs, or acts," is "relevant only if the jury can conclude by a preponderance of the evidence that the extrinsic act occurred and that the defendant was the actor[]"), *disc. review denied*, 331 N.C. 287, 417 S.E.2d 256 (1992). The State acknowledges in its brief that there was no evidence linking Defendant to those four prior assaults. In fact, Cates testified that it was exceptionally clear that two different people committed two of the earlier assaults. Thus, we think Defendant could have prevailed on a relevancy objection to the map as admitted. Additionally, while Parker's testimony that *he* was using and selling drugs on the night of the murder bore directly on his credibility, Parker's testimony that *Defendant* was using and selling drugs was objectionable under Rule 404(b). We also think Defendant could

STATE v. DEAN

[196 N.C. App. 180 (2009)]

have prevailed on a relevancy objection to Smith's testimony concerning gang beliefs generally and the specific graffiti contained on the papers discovered in the duplex. Finally, we think Defendant could have prevailed on an objection to the admission of the unredacted fingerprint card and Paylor's accompanying testimony. *State v. Jackson*, 284 N.C. 321, 331-33, 200 S.E.2d 626, 632-33 (1973) ("The introduction in evidence of a fingerprint record containing extraneous material which in itself is incompetent may or may not constitute reversible error, depending on such factors as whether the material was or was not seen by the jury or whether the objection thereto was waived by the defendant.") (quotation marks and citation omitted). We do not conclude, however, that the jury *probably* would have reached a different verdict had any or even all[3] of the challenged evidence been excluded.

The now-challenged evidence was not the only evidence which tended to show that Defendant was guilty of first-degree murder. The competent and non-objectionable evidence introduced by the State tended to show that Defendant was present at the scene of the shooting and was firing the .38 caliber gun at Reginald Johnson.[4] We acknowledge that the testimony of some of the State's witnesses placing Defendant at the scene was repeatedly contradicted or was otherwise seemingly incredible. That testimony, however, was competent for the jury's consideration, and it was for the jury to resolve contradictions and credibility issues. Given the non-objectionable evidence against Defendant and in light of the requirement that at least one of the objectionable pieces of evidence would have to rise to the level of plain error for Defendant to be entitled to a new trial, we are of the opinion that the challenged evidence did not tilt the scales and cause the jury to reach its verdict. Accordingly, we conclude that the admission of these evidentiary items does not amount to plain error.

## 4. CLOSING ARGUMENT

[4] In his final argument, Defendant contends that he is entitled to a new trial because the prosecutor made no fewer than six improper statements during closing argument. Defendant objects to the following emphasized portions of statements made by the prosecutor during the argument:

---

3. *But see Holbrook, supra.*

4. Under the principle of acting in concert, Defendant need not have fired the bullet that killed Reginald in order to be found guilty.

STATE v. DEAN

[196 N.C. App. 180 (2009)]

You don't want to believe [Parker] and you don't want to believe Anthony Douglas? What do we find? We find two buildings on Weaver Street with a driveway in between, with a van pointed that way, with a dumpster at the end with a playground behind it, with a rec center over there. We find .380 casings basically exactly where [Parker] said [Defendant] was. We find nine millimeter casings basically exactly where [Parker] said Juicie was standing. And we find .40 caliber casings just about exactly where [Parker] said [Mitchell] was standing.

You don't have to like Phillipe Parker. But the evidence shows that he's telling you *the truth.*

. . . .

You have to remember what the evidence is. . . . We had 18 witnesses. All 18 witnesses either have to be wrong, mistaken, or lying, or some combination thereof to bring this to you. Because it makes too much sense together to be anything else.

A mistake is one thing. This would have to be an outright conspiracy. . . .

This is not a mistake. This is too cohesive to be anything but an elaborate conspiracy to be anything else but *the absolute truth.*

. . . .

If you don't want to trust anything else why don't you trust the forensic evidence that really wasn't cross examined. . . .

Ms. Reid picked up a shell casing that was found on Liberty Street. Adam Tanner was the one that tested it and told you this morning this gun fired it.

What a monumental coincidence that the same gun is used May 4th on Liberty Street, May 6th on Weaver Street, and found May 19th on Holloway Street with [Defendant's] fingerprint in the ammunition box right next to it.

That's even taking [Parker] out of it. That's even taking [Parker] out, saying don't even worry about *[Parker] saying that this is the gun [Defendant] had and that he was shooting.* Take [Parker] out of it, that's what you've got. That in and of itself again shows you [Defendant] was shooting this gun.

. . . .

*We have [Defendant's] fingerprint being on a gun* with those shell casings found on the scene.

. . . .

[Parker] was not charged with this incident. Take that for what it's worth. Could he be charged with it? Sure. . . . In a perfect world, . . . all six of them would be convicted and go away for first degree murder. In a perfect world. The problem is we don't live in a perfect world.

*And sometimes to prove these cases and to get the people who as best as we can determine really deserve to go to trial or to face the charge we've got to make some tough decisions. And so the decision was made in this case, let's use [Parker] and try and go after the shooters.* Because that's what the evidence shows is that others were shooting.

. . . .

The fingerprint report talking about points of identification. . . . Remember [Campen] talking about . . . the numbers of the points of identification in a fingerprint that you can find and how there are up to what was it, 75 to 125 points on everybody's finger and stuff. And he found nine points on one of the ID's for—in this case and ten on another one.

Well, my goodness, if there are so many points of identification and you only have, you know, nine or ten, how can you make an identification based on that?

Well, weigh the circumstances as you find it from the evidence in this trial. You have [Campen] who [said] he's been basically working in this field I think he said since 1974. . . .

He's been doing fingerprints I believe it clearly was from the '80s sometime. And that he has testified as an expert several times, both here in State courts and in Federal courts for fingerprint identification and examination.

*Does it make sense to you that he would be so far off and all these other courts would be qualifying him as an expert and that he'd be allowed to be qualified as an expert here*—and you judge him. You judge him for his credibility.

(Emphasis added.) Defendant acknowledges that he did not object to any of the statements when they were made, but argues that the com-

ments were so grossly improper as to require the trial court to inter-vene *ex mero motu*.

It is well-settled that counsel is permitted to argue to the jury the facts that have been presented as well as all reasonable inferences that can be drawn therefrom. *State v. Smith*, 351 N.C. 251, 269, 524 S.E.2d 28, 41, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000).

> During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his per-sonal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, how-ever, on the basis of his analysis of the evidence, argue any posi-tion or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230(a) (2003). A trial court is not required to intervene *ex mero motu* " 'unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial.' " *Smith*, 351 N.C. at 269, 524 S.E.2d at 41 (quoting *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999)). Where a defendant does not object to state-ments made during an argument, the standard of review on appeal is whether the prosecutor's remarks were so grossly improper that the trial court's decision not to intervene *ex mero motu* constituted an abuse of discretion. *State v. Barden*, 356 N.C. 316, 356, 572 S.E.2d 108, 134 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003).

Even assuming that at least one of the prosecutor's statements was improper, we nevertheless conclude that Defendant has not met "the heavy burden of showing that the trial court erred in not inter-vening on his behalf." *State v. Thompson*, 188 N.C. App. 102, 110, 654 S.E.2d 814, 819, *disc. review denied*, 362 N.C. 371, 662 S.E.2d 391 (2008). Defendant cites only one case in which a new trial was ordered because the trial court erred in failing to intervene during a closing argument: *State v. Smith*, 279 N.C. 163, 181 S.E.2d 458 (1971). In that case, the Supreme Court described the following as "the more flagrant" of the prosecutor's "transgressions[]" during the argument:

> "I know when to ask for the death penalty and when not to. This isn't the first case; it's the ten thousandth for me. . . . I did . . . have in this courtroom three weeks ago a man charged with a sexual assault . . . who was as innocent of it as I. . . . I hope my reputa-

tion in this community where you elected me to this office that I try not an innocent man . . . . When I found that out about that case . . . no one was on his feet faster than I to come to his defense . . . . I wanted to tell you about that and get back to the facts of this case."

In characterizing the defendant, the solicitor said that a man who would do what this woman says this defendant did is "lower than the bone belly of a cur dog."

During the State's evidence, the investigating officer had quoted the defendant as saying that he worked for his employer, the bus company, on May 8, 1969. The solicitor said: "Liar! No, Mr. Smith, State's Exhibit #2 says you were not working that day." Exhibit #2 introduced in evidence by the State was the bus company's work record showing that on May 8, 1969, the defendant began work at 5:43 a.m., was off duty from 9:26 a.m. until 2:22 p.m. and was checked out at 5:14 p.m.

In discussing the defendant's evidence of his good character the solicitor said: "I don't care who they bring in here . . . to say to you that his character and reputation in the community in which he lives is good. I tell you it isn't worth a darn. . . . I don't believe a living word of what he says about this case, members of the jury . . . ."

*Id.* at 165-66, 181 S.E.2d at 459-60. None of the allegedly improper statements in the case at bar stray as far from the bounds of propriety as the prosecutor's comments in *Smith* which warranted a new trial in that case. Considering the context in which the statements were made and their relative brevity as compared to the closing argument as a whole, as we must, *State v. Taylor*, 362 N.C. 514, 536, 669 S.E.2d 239, 259 (2008), we conclude that the trial court did not abuse its discretion in electing not to intervene *ex mero motu.*

## CONCLUSION

Defendant's trial was free of reversible error.

NO ERROR.

Judge STEELMAN concurs.

Judge GEER concurs in part and concurs in the result in part in separate opinion.

GEER, Judge, concurring in part and concurring in the result only in part.

I concur in the majority opinion, but write separately because I have a somewhat different view of certain of the evidentiary issues. I concur fully with the majority's discussion of the removal of the courtroom spectators, the admission of the testimony of Harvey Jones, and the State's closing argument.

With respect to the evidence that the .380 was used in other crimes, I believe that defendant's argument on appeal regarding plain error disregards the defense presented at trial. Defendant repeatedly elicited from the State's witnesses the fact that guns were shared by gang members. Defendant then, after the State presented the evidence of the other crimes committed using the gun, established on cross-examination that on at least two of the occasions, the police had established that someone other than defendant had been using the gun. In addition, defendant elicited testimony that the gun had been used in the killing of Carlos Clayton, a murder attributed to the State's key witness, Phillipe Parker.

In defense counsel's closing argument, he argued at length that the State's evidence regarding the use of the gun in other crimes meant that the State could not prove that defendant was using the gun on 6 May 2004. In a portion of that part of defense counsel's closing, he asserted:

> Isn't it amazing that when the SBI folk testified about all the times the gun's been used, Cates even said that this is an astronomical amount of times that gun's been used. A .380 handgun's been used quite frequently.

> Why is that important? Because I contend to you that gun passed around as much as a dollar bill. The fact that somebody has a[] dollar bill in their pocket, does that mean that you had it two day [sic] prior or three days prior? No. When something transfers and it gets shared so much you can't say when somebody had it unless they had it in their possession.

> Same thing with this weapon, this .380 handgun. Used by many persons. Many. Even up to April 22, 2004, Little Whammer, AKA William Cox, had the weapon. This is only a week right before Mr. Jones got shot.

In other words, defendant did not object to this evidence at trial because it supported his defense. Under those circumstances, the admission of the evidence cannot be plain error.

For the same reason, I do not believe the admission of Mr. Parker's testimony that defendant used and sold drugs the night of the shooting was plain error. *Defense counsel* emphasized that Mr. Parker was using drugs *with defendant*. Defense counsel contended in closing that Mr. Parker's testimony was the linchpin of the State's case and that Mr. Parker's testimony should be deemed not credible, among other things, because of his extensive drug use the night at issue. Defense counsel outlined all of Mr. Parker's drug usage (which necessarily included defendant's drug usage) on 5 May to 6 May 2004 and then argued: "So now the State's number one witness is on drugs and high with a buzz. One who made all these diagrams, reportedly, gave all this testimony. High on drugs." Again, defense counsel did not object to the testimony regarding drug usage—which included Mr. Parker's and defendant's joint drug usage—because it was important to the impeachment of the State's most important witness.

With respect to the evidence of gang beliefs and gang graffiti, the entire theory of the trial for both the State and defendant was that this murder was a gang shooting. Defendant argued only that he did not participate in the gang shooting. Far from attempting to exclude gang-related evidence, defendant sought to establish that the State's witnesses were each gang members. Defendant even elicited evidence suggesting that the victim, Mr. Johnson, was a gang member. Defendant also used the evidence of gang beliefs and practices himself to suggest alternative theories as to what occurred on 6 May 2004. Given the State's theory and defendant's defense, I am not convinced that the evidence was irrelevant. Certainly, however, its admission cannot be plain error given the arguments made in the case and the unchallenged evidence presented by both the State and defendant.

Finally, I agree with defendant that if there had been an objection, then the arrest information on the fingerprint record should have been excluded. I cannot, however, conclude that evidence that defendant had been arrested two years earlier for drug possession tilted the scales when the jury was deciding whether or not to convict defendant of murder. Accordingly, I agree with the majority opinion that there was no plain error.