IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-599

No. COA22-9

Filed 6 September 2022

Wake County, No. 20 CRS 1429

STATE OF NORTH CAROLINA

v.

YON HWAR SEE

Appeal by defendant from judgment entered 7 May 2021 by Judge Rebecca W. Holt in Wake County Superior Court. Heard in the Court of Appeals 10 August 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Jonathan J. Evans, for the State.*

*Daniel M. Blau for defendant-appellant.*

ZACHARY, Judge.

Defendant Yon Hwar See appeals from a judgment entered upon a jury's verdicts finding her guilty of driving while impaired and felony death by vehicle. On appeal, Defendant challenges the trial court's denial of her request for discovery of the City-County Bureau of Identification laboratory's audit, non-conformity, and corrective-action records, as well as the admission of her blood test results into evidence. After careful review, we conclude that Defendant received a fair trial, free from error.

## *Background*

While driving to work at approximately 6:00 a.m. on 23 June 2020, Defendant fatally struck a pedestrian, Patrick Simmons, with her vehicle. Mr. Simmons had been "walking on or near the fog line in the right lane" of the road when Defendant's car struck him from behind. The front windshield of Defendant's car was "smashed[,]" and the front bumper was dented. The portion of the road at which the collision occurred was "perfectly straight[,]" and driving conditions that morning were clear.

Shortly after the collision, Lindsey Childs noticed "what [she] initially assumed to be just some discarded clothes on the side of the road[,]" but which she determined upon closer examination to be the body of Mr. Simmons. Ms. Childs pulled over and approached Defendant's car "to make sure she was okay." Defendant "didn't make eye contact" with Ms. Childs and "didn't say anything" to her; she was "[j]ust sitting, staring straight forward" in her car. Ms. Childs then called 9-1-1.

At approximately 7:00 a.m., Raleigh Police Department Officer Lee Granger arrived at the scene of the collision to serve as the lead investigator. Several other law enforcement officers were already present. Officer Granger did not administer any standardized field sobriety tests to Defendant at any point during his investigation, because other officers informed him that "someone had already checked her out for alcohol, and there was no alcohol in this case."

¶ 5     Officer Daniel Egan, a member of the Raleigh Police Department's Crash Reconstruction Unit, responded to the scene at approximately 7:15 a.m. Other law enforcement officers told Officer Egan that Defendant had performed the standardized field sobriety tests, and that alcohol was not a factor. Consequently, Officer Egan did not administer any standardized field sobriety tests or otherwise inquire into Defendant's level of impairment during his investigation.

¶ 6     Officer Granger cited Defendant with misdemeanor death by vehicle. While he spoke with Defendant, Officer Granger was wearing a mask due to the COVID-19 pandemic; Defendant was also wearing a mask. Officer Granger informed Defendant of her implied consent rights and requested a sample of her blood for chemical analysis. Defendant consented, and at 8:43 a.m., a paramedic collected two vials of Defendant's blood at the scene.

¶ 7     Officer Granger then transported the "blood kit" containing Defendant's blood sample to the City-County Bureau of Identification ("CCBI") laboratory for testing. Dr. Richard Waggoner, employed in the CCBI's DWI Blood Chemistry Department, received Defendant's blood kit on 26 June 2020 and conducted the chemical analysis on 6 July 2020. His analysis revealed that on the morning of 23 June 2020, Defendant had a blood-alcohol concentration of 0.18 grams per 100 milliliters. Later, at trial, both Officers Granger and Egan admitted that they were surprised by the results of

Defendant's blood analysis, and stated that they would have investigated the scene differently if they had known at the time that Defendant was impaired.

On 12 October 2020, a Wake County grand jury indicted Defendant for felony death by vehicle, driving while impaired, and failure to reduce speed. The next day, the State dismissed the charge of misdemeanor death by vehicle.

On 12 March 2021, Defendant filed a motion for voluntary discovery. On 22 March 2021, after consultation with her toxicology expert, Defendant filed a request for additional voluntary discovery and a motion to continue, seeking documents and records of the CCBI laboratory "relating to testing protocols, operating procedures and maintenance records." Specifically, Defendant sought, *inter alia*:

> 10. Findings of any and all *internal* laboratory audits from 6/26/2019 (year prior to sample submission to laboratory) to [22 March 2021].
>
> 11. Findings of any and all *external* laboratory audits from 6/26/2019 (year prior to sample submission to laboratory) to [22 March 2021].
>
> 12. Records of all corrective actions, non-conformities, and/or non-conforming events <u>received at any time</u> for <u>all</u> laboratory employees that were in custody of the blood sample.

Defendant's request for additional voluntary discovery came on for hearing on 12 April 2021 in Wake County Superior Court. Regarding requests 10, 11, and 12, Defendant contended that these materials were necessary to enable her expert to conduct a peer review of Dr. Waggoner's analysis of her blood sample, in that

"[i]nternal and external audits are tools for peer review that are recognized as an accepted practice in the field of forensic toxicology." The State argued that the requests were "overbroad and irrelevant[,] . . . amounting to nothing more than a fishing expedition." When the trial court asked Defendant's counsel whether he had "some reason to believe there may be [exculpatory] information" contained in the laboratory's audit, non-conformity, and corrective-action records, Defendant's counsel conceded that he was "not able to make a plausible showing" as to why he thought that the materials contained exculpatory evidence.

¶ 11        Dr. Waggoner testified at the hearing. He explained the auditing processes conducted at the CCBI laboratory:

> Every year our accrediting body requires us to perform an internal audit of the entire laboratory process, including management and technical aspects of the entire process.
>
> And then every two years an accrediting body will send auditors externally that will inspect the entire process of our laboratory and perform a total and complete audit.

Dr. Waggoner further explained that there are six separate sections of the CCBI, but that the auditors perform "one comprehensive audit of the entire laboratory." He opined that neither the audits nor any corrective-action records would be necessary to perform a peer review of the chemical analysis process, and that he would only consider such materials necessary "if [he] saw issues in the quality control documents."

¶ 12        On 14 April 2021, the trial court entered an order denying without prejudice Defendant's requests for the items described in numbers 10, 11, and 12, finding that these requests were "overly broad[.]" The court granted Defendant's requests for the remaining items that the State had not yet provided.

¶ 13        Defendant's case came on for trial on 3 May 2021 in Wake County Superior Court. At trial, Defendant's expert did not testify.

¶ 14        Dr. Waggoner testified at length as the State's expert, describing the processes and protocols he followed while conducting the blood analysis. Dr. Waggoner explained that he arrived at the 0.18 blood-alcohol concentration figure by averaging the results gathered from the two smaller samples he tested, which were derived from one of the vials of Defendant's blood in the blood kit that Officer Granger provided to the CCBI. He further explained that he purposefully spaced out the testing of Defendant's smaller samples in order to reduce the likelihood of any repeated error, and that he had the results reviewed by another analyst to ensure their accuracy. Dr. Waggoner also stated that "[i]f alcohol is contaminated with a yeast and it's not preserved and it's exposed to elevated temperatures, there is a possibility that some fermentation could occur. But if it's preserved, collected under aseptic conditions, and refrigerated, there's virtually no possibility of that occurring." He detailed the process by which he ensures proper calibration of the machines used for the blood analysis,

and explained that there was a 99.73% probability that his calculations were within 0.012 grams per milliliter of the 0.18 figure he ultimately calculated.

¶ 15    At the close of the State's evidence, the trial court granted Defendant's motion to dismiss the charge of failure to reduce speed. On 7 May 2021, the jury returned verdicts finding Defendant guilty of the remaining charges. The trial court arrested judgment on the driving while impaired conviction, and sentenced Defendant to a mitigated sentence of 50 to 72 months in the custody of the North Carolina Division of Adult Correction for the felony death by vehicle conviction.

¶ 16    Defendant timely appealed.

## *Discussion*

¶ 17    On appeal, Defendant argues that the trial court "erred by denying [her] discovery request[s] for audit, non-conformity, and corrective-action records from the CCBI laboratory, in violation of N.C. Gen. Stat. § 15A-903 and Article I, Sections 19 and 23 of the North Carolina Constitution." Defendant also contends that the trial court plainly erred by admitting her blood test results into evidence because her consent to the blood draw was not knowing, voluntary, or intelligent.

### I.    *Standard of Review*

¶ 18    "We review a [trial court's] ruling on discovery matters for an abuse of discretion." *State v. Pender*, 218 N.C. App. 233, 240, 720 S.E.2d 836, 841, *appeal dismissed and disc. review denied*, 366 N.C. 233, 731 S.E.2d 414 (2012). "An abuse of

discretion will be found where the ruling was so arbitrary that it cannot be said to be the result of a reasoned decision." *Id.* (citation omitted).

## II.    *Requests for Voluntary Discovery*

¶ 19        Defendant first contends that the trial court "should have allowed discovery" of the CCBI laboratory's audit, non-conformity, and corrective-action records pursuant to N.C. Gen. Stat. § 15A-903 because these items may have contained information demonstrating "an increased possibility of user error in the operation of th[e] machine" used to analyze her blood sample. We disagree.

¶ 20        This Court broadly construes a defendant's right to discovery pursuant to N.C. Gen. Stat. § 15A-903, which governs discovery matters in criminal cases. *State v. Dunn*, 154 N.C. App. 1, 9, 571 S.E.2d 650, 655 (2002), *supersedeas and disc. review denied*, 356 N.C. 685, 578 S.E.2d 314 (2003).

¶ 21        The parties cite no cases that directly address whether a defendant has a right to discover a laboratory's audit, corrective-action, or non-conformity records pursuant to N.C. Gen. Stat. § 15A-903(a)(1)a. Nevertheless, we find instructive opinions in which the defendant's right to discovery was evaluated under the prior version of the statute, N.C. Gen. Stat. § 15A-903(e),[1] in that the right to discovery that was

---

[1] N.C. Gen. Stat. § 15A-903(e) granted defendants the right "to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case, or copies thereof, within the possession,

articulated in subsection (e) is similar to a defendant's right to discovery pursuant to § 15A-903(a)(1)a. *Compare* N.C. Gen. Stat. § 15A-903(e) (2003), *with id.* § 15A-903(a)(1)a (2021).

¶ 22     Section 15A-903(a)(1) now provides that "[u]pon motion of the defendant, the court must order . . . [t]he State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant." N.C. Gen. Stat. § 15A-903(a)(1) (2021). For the purpose of § 15A-903, such "files" include any "matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant." *Id.* § 15A-903(a)(1)a.

¶ 23     Furthermore, "[w]hen any matter or evidence is submitted for testing or examination, in addition to any test or examination results, all other data, calculations, or writings of any kind shall be made available to the defendant, including, but not limited to, preliminary test or screening results and bench notes." *Id.*; *see State v. Cunningham*, 108 N.C. App. 185, 195, 423 S.E.2d 802, 808 (1992) (concluding that N.C. Gen. Stat. § 15A-903(e) (1988) "must be construed as entitling

---

custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor." N.C. Gen. Stat. § 15A-903(e) (2003). However, this provision was removed in 2004 upon the General Assembly's amendment to N.C. Gen. Stat. § 15A-903. *See* An Act to . . . Provide for Open Discovery in All Felony Cases . . . , S.L. 2004-154, § 4, 2004 N.C. Sess. Laws 515, 517–20.

a criminal defendant to pretrial discovery of not only conclusory laboratory reports, but also of any tests performed or procedures utilized by chemists to reach such conclusions").

¶ 24        Nonetheless, a defendant's right to voluntary discovery is not unlimited. When an examination or test is conducted in a defendant's case, the State need not provide "information concerning peer review of the testing procedure, whether the procedure has been submitted to the scrutiny of the scientific community, or is generally accepted in the scientific community." *State v. Fair*, 164 N.C. App. 770, 774–75, 596 S.E.2d 871, 874 (2004). Such information "is beyond the scope of N.C. Gen. Stat. § 15A-903's discovery provisions" because access to this type of information is not "necessary for the defendant to understand the testing procedure and to conduct an effective cross-examination of the State's expert witness." *Id.* at 774, 596 S.E.2d at 873–74; *see also Cunningham*, 108 N.C. App. at 196, 423 S.E.2d at 809 (concluding that the defendant was entitled to additional discovery because the chemist's report— which contained "only the ultimate result" of the tests performed—"d[id] not enable [the] defendant's counsel to determine what tests were performed and whether the testing was appropriate, or to become familiar with the test procedures").

¶ 25        In the instant case, Defendant contends that she "cannot cross-examine a machine, so it [wa]s vitally important that she have access to information in the State's possession that may show an increased possibility of user error in the

operation of th[e] machine" that Dr. Waggoner used to analyze her blood samples and determine her blood-alcohol concentration.

¶ 26    After careful review of the record, we conclude that the trial court did not abuse its discretion in denying in part Defendant's request for additional voluntary discovery, as Defendant was provided with sufficient information to become familiar with the testing procedure and to adequately cross-examine Dr. Waggoner. Apart from the documents requested in numbers 10, 11, and 12, the State provided—either voluntarily or by court order—substantial laboratory information. Such discovery included the CCBI laboratory's standard operating procedure and quality control logs; the laboratory's maintenance records from 6 July 2019 through 6 July 2020 for both machines that were used to analyze the blood samples; the maintenance records from the same period for "any analytical balances used"; the records of temperature in the refrigerators containing the blood samples and the analytical controls; the laboratory's internal chain of custody records; the chromatography data for the calibrators and controls relevant to the blood samples; and the certificate of laboratory accreditation.

¶ 27    At the 12 April 2021 hearing, Dr. Waggoner explained the significance of these materials. The quality control logs contain a variety of testing information, such as data concerning the quality control samples, which are used "to check the entire process to see if there's anything that could be amiss with it." The maintenance

records indicate whether the laboratory followed the CCBI maintenance schedule. The records of temperature in the refrigerators could potentially reveal "noncompliance" with protocols, which could affect the laboratory's testing accuracy and accreditation. And the chromatography data for the calibrators and controls indicate whether the machines were properly operating at the time of the analysis.

¶ 28 Defendant was then able to use this information during her cross-examination of Dr. Waggoner to challenge the validity of the blood analysis. Her counsel extensively questioned Dr. Waggoner—who performed the analysis—regarding the testing processes and protocols, as well as his compliance with the protocols. Defense counsel also inquired as to whether the samples were refrigerated prior to Dr. Waggoner's testing, which Dr. Waggoner did not know, and which he admitted could affect the blood-alcohol concentration test results. Furthermore, Dr. Waggoner confirmed during cross-examination that the CCBI laboratory does not "quality control test" the blood kits; he acknowledged that he did not know "whether the iodine was used correctly in sterilizing the injection point on [Defendant] when her blood was taken," which could affect the results; and he conceded that carryover of alcohol content from one blood sample to another during testing "is always a concern" because it could affect the accuracy of the tests.

¶ 29 The trial court provided Defendant with pretrial discovery of not only the "conclusory laboratory report[ ]," but also "any tests performed or procedures utilized

by" Dr. Waggoner to reach his conclusions, thereby sufficiently "enabl[ing D]efendant's counsel to determine what tests were performed and whether the testing was appropriate, [and] to become familiar with the test procedures." *Cunningham*, 108 N.C. App. at 195–96, 423 S.E.2d at 808–09. Because Defendant was able "to understand the testing procedure and to conduct an effective cross-examination of the State's expert witness" with the discovery provided to her, *Fair*, 164 N.C. App. at 774, 596 S.E.2d at 873, we conclude that the trial court did not abuse its discretion in denying her request for the laboratory's audit, non-conformity, and corrective-action records, *see Pender*, 218 N.C. App. at 240, 720 S.E.2d at 841.

¶ 30        Defendant next contends that the trial court's denial of her requests concerning the laboratory's audit, non-conformity, and corrective-action records "violated [her] state constitutional rights to due process, a fair trial, confrontation, and compulsory process." Again, we disagree.

¶ 31        A defendant's right to discovery of exculpatory information stems from the United States Constitution. *See Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963). In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* "Favorable evidence is material if there is a reasonable probability that its disclosure to the defense would result in a different

outcome in the jury's deliberation." *State v. Strickland*, 346 N.C. 443, 456, 488 S.E.2d 194, 202 (1997) (citation and internal quotation marks omitted), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). The North Carolina Constitution provides similar protections. *See Cunningham*, 108 N.C. App. at 196, 423 S.E.2d at 809. However, "[t]he defendant has the burden of showing that the undisclosed evidence was material and affected the outcome of the trial." *State v. Tirado*, 358 N.C. 551, 589–90, 599 S.E.2d 515, 541 (2004), *cert. denied*, 544 U.S. 909, 161 L. Ed. 2d 285 (2005).

¶ 32 In the present case, Defendant advances no argument that the trial court's denial, in part, of her additional discovery requests violated her federal constitutional rights, only asserting that the court "should have allowed the discovery under Article I, Sections 19 and 23 of the state constitution." Defendant fails to explain how the court's actions violated her constitutional rights. She cites no authority to support her propositions beyond the mention of "Article I, Sections 19 and 23 of the state constitution" and a recital of what she asserts are the "unique facts of this case[.]" As such, we have no legal basis upon which to review this alleged error. *See* N.C.R. App. P. 28(b)(6). Furthermore, "[i]t is not the role of this Court to craft [D]efendant's arguments for h[er]." *State v. Earls*, 234 N.C. App. 186, 192, 758 S.E.2d 654, 658, *disc. review denied*, 367 N.C. 791, 766 S.E.2d 643 (2014).

¶ 33    Regardless, Defendant is unable to demonstrate "that the undisclosed evidence was material and affected the outcome of the trial." *Tirado*, 358 N.C. at 590, 599 S.E.2d at 541. Her argument fails accordingly.

### III.    *Admission of Blood Test Results*

¶ 34    Finally, Defendant argues that the trial court plainly erred by admitting the blood test results into evidence, in that her "consent for the blood draw was not knowing, voluntary, or intelligent, in violation of the" federal and state constitutions.

¶ 35    Defendant concedes that her counsel did not argue such constitutional violations below, so that this issue has not been preserved for appellate review. Thus, Defendant requests that we invoke Appellate Rule 2 to review this purported constitutional error. We decline to do so. *See State v. Dean*, 196 N.C. App. 180, 188, 674 S.E.2d 453, 459 ("Defendant never presented any constitutional arguments to the trial court, and we will not address such arguments for the first time on appeal."), *appeal dismissed and disc. review denied*, 363 N.C. 376, 679 S.E.2d 139 (2009); *see also State v. Register*, 206 N.C. App. 629, 634, 698 S.E.2d 464, 469 (2010).

### *Conclusion*

¶ 36    For the foregoing reasons, we conclude that Defendant received a fair trial, free from error.

NO ERROR.

Judges INMAN and GRIFFIN concur.