An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-1134

Filed 16 July 2025

Robeson County, Nos. 18CRS055963-770, 20CRS000606-770

STATE OF NORTH CAROLINA

v.

TIMMY CORBETT LEDWELL, Defendant.


Appeal by defendant from judgments entered 27 July 2022 by Judge James G. Bell in Superior Court, Robeson County. Heard in the Court of Appeals 27 February 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Caden W. Hayes, for the State.*

> *Kimberly P. Hoppin for defendant-appellant.*


STROUD, Judge.


Defendant appeals from judgments convicting him of first-degree murder and first-degree burglary. Defendant contends he received ineffective assistance of counsel during his trial, the trial court erred in allowing admission of certain evidence, and the trial court erred by allowing some spectators of the trial to wear shirts advocating for justice for the victim. We conclude Defendant received a fair

trial, free from prejudicial error.

## I.    Background

The State's evidence tended to show that Defendant and the victim, Pamela Roberts, met on Facebook and eventually began a romantic relationship.  Pamela eventually moved to Lumberton to live closer to Defendant.  Sherry Bridgeman owned a barbecue restaurant in Lumberton and one day Pamela came to the restaurant asking Sherry for a job.  Sherry offered Pamela a job to begin the following week, but she did not show up for the job as scheduled.  After about two weeks, Pamela told Sherry she did not show up for work because her boyfriend, Defendant, had "beat her, and she didn't want to come in looking that way."  Sherry ultimately offered to let Pamela stay at her home and work at her restaurant and Pamela accepted.  When Pamela arrived at Sherry's house, the "driver's side window" of her car was shattered and Pamela "had glass in her hair" because Defendant had thrown "a full Natty Daddy beer" through the window.

Pamela would stay at Sherry's house on and off for some time but would go back to see Defendant as she was scared of him "[b]ecause of the previous beatings." After a hurricane hit the area, Pamela asked Sherry if she and Defendant could stay at Sherry's house, and Sherry "agreed to let him stay the one night" but Defendant ended up staying for "numerous days."  However, due to damage from the hurricane, Sherry, Pamela, and Defendant had to leave Sherry's house due to flooding.  Sherry moved to a friend's house and Defendant did "[n]ot initially" stay there but "[h]e did

stay there some[.]" Sherry paid the rent and utilities and Defendant did not contribute to either.

Around 4:00 am on 17 November 2018, Sherry heard something while she was sleeping. Defendant knocked on Sherry's door and stated he "needed to get some clothes." Sherry noticed Defendant had an armband from the hospital on his wrist and Defendant said "he had been to the hospital, had had a light heart attack, and the police had brought him there to get his clothes, but they weren't there at that time." Sherry allowed Defendant into the house to warm up as "[i]t was so cold." Defendant's clothes were in Pamela's room, so Sherry "tapped on the door [and] said Pam, you need to go to my bedroom and shut the door, and let [Defendant] get his clothes." Pamela stated that was not necessary and she put a plastic container with Defendant's clothes in the doorway for Sherry to get. Defendant "started pilfering through the clothes" and said he "need[ed] to get [his] pictures of [his] momma because its all [he] got left of her." Pamela came to the door and handed Sherry a box of pictures and said to Defendant "does this really need to transpire at 4:00 in the morning." Defendant then "went crazy."

Defendant grabbed a butcher knife from Sherry's kitchen and Sherry tried to calm Defendant down but he put the knife up close to her head and said "move, bitch, because you're going to die tonight." Defendant began kicking on Pamela's bedroom door and "beating on it and finally got it open." Pamela was inside a bathroom off the bedroom and Defendant started to kick the bathroom door in. Sherry ran out of the

house, went to a nearby store, and borrowed a phone to call 911. Sherry heard Pamela screaming for help as she was leaving to call 911; Pamela yelled, "he's going to kill me." By the time Sherry got back to the house, police had arrived and she was not allowed back in. Defendant had stabbed Pamela seven times and one of the stab wounds was fatal.

Deputy Roy Grant and Deputy Derrick Buffkin with the Robeson County Sheriff's Office responded to the house. The deputies found Defendant "leaning over [Pamela]. [Pamela] was laying on the floor on her back." Deputy Grant testified when he first walked into the house he heard "a male hollering" and heard Defendant stating "Pam, I'm sorry, I didn't mean to, Pam, wake up, Pam, get up." Defendant said to the deputies "if she's gone I'm going with her. And he took a knife in his right hand and . . . tried to cut his own neck." Deputy Buffkin disarmed Defendant before he could handcuff him and render aid.

Defendant was indicted on 3 February 2020 for first-degree murder and on 6 July 2020 for first-degree burglary and assault with a deadly weapon with intent to kill. Trial began on 27 June 2022. During opening statements, Defendant's attorney admitted that Defendant had stabbed Pamela but also challenged the credibility of law enforcement, the witnesses, and the circumstances of the stabbing. On 5 July 2022, while trial was ongoing, Defendant filed a "Motion to Exclude Certain Photographic Evidence." (Capitalization altered.) Defendant sought to exclude as irrelevant under North Carolina Rule of Evidence 402 a pair of scissors recovered

from the scene because "[t]he prosecution does not claim [they] were used or involved in any way in the commission of the crimes alleged." Defendant also argued that since there would be evidence admitted of his 2005 stabbing of a different victim using scissors, the scissors were unduly prejudicial under North Carolina Rule of Evidence 403. The State argued the admission of the scissors was proper to "show thoroughness and . . . show what [law enforcement] did during the crime scene investigation[.]" The trial court ultimately denied the motion.

On the fourteenth day of the trial, Defendant objected to people sitting in the gallery wearing shirts which read "Justice for Mom."[1] Defendant's attorney stated those wearing the shirts were members of Pamela's family and members of the family of the victim from the 2005 stabbing. He argued "[t]his is an advocacy attempt trying to influence the jury." After a long colloquy with defense counsel and the State, the trial court ultimately denied the motion and "allow[ed] the one lady to sit there on the front row. And then everybody else on a row behind her[.]" During closing arguments, defense counsel again admitted Defendant kicked in the door and stabbed Pamela but questioned the credibility of the evidence and argued Defendant was so intoxicated he did not have the requisite intent for murder.

On or about 22 July 2022, the jury found Defendant guilty of first-degree

---

[1] We note that in the trial court's discussion of the t-shirts, the court and counsel state the shirts stated "Justice for Pam" but the picture of the shirts contained in our record show the shirts stated "Justice for Mom."

murder "[b]oth on the basis of malice, premeditation, deliberation and under the first-degree felony murder rule" and of first-degree burglary and not guilty of assault with a deadly weapon with intent to kill. The trial court entered judgment on the first-degree murder and first-degree burglary charges on 27 July 2022 and sentenced Defendant to life imprisonment without parole. Defendant entered oral notice of appeal in open court on 22 July 2022 and also filed written notice of appeal on 29 July 2022.

## II. Ineffective Assistance of Counsel

Defendant first argues he "was deprived of the effective assistance of counsel where trial counsel made certain admissions during his opening statement to the jury, and during trial, without [Defendant's] prior knowledge or consent." (Capitalization altered.) We disagree.

"On appeal, this Court reviews whether a defendant was denied effective assistance of counsel de novo. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Foreman*, 270 N.C. App. 784, 788, 842 S.E.2d 184, 187 (2020) (citations and quotation marks omitted).

Ineffective assistance of counsel generally requires a defendant to show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *State v. Harbison*, 315 N.C. 175, 178-79, 337 S.E.2d 504, 506 (1985) (citation omitted). Our Supreme Court established in *Harbison* "when counsel

to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed." *Id*. at 180, 337 S.E.2d at 507. "*Harbison* applies when defense counsel concedes [a] defendant's guilt to either the charged offense or a lesser included offense. But *Harbison* does not apply where defense counsel has conceded an element of a crime charged, while still maintaining the [d]efendant's innocence." *Foreman*, 270 N.C. App. at 788-89, 842 S.E.2d at 188 (citations and quotation marks omitted). Further, "[a]dmitting a fact is not equivalent to an admission of guilt." *State v. Wiley*, 355 N.C. 592, 620, 565 S.E.2d 22, 42 (2002) (citation omitted).

Here, Defendant was convicted of first-degree murder and first-degree burglary. "First-degree murder is, *inter alia,* the unlawful killing of a human being committed with malice, premeditation, and deliberation." *State v. Bedford*, 208 N.C. App. 414, 417, 702 S.E.2d 522, 526 (2010) (citation omitted). "The essential elements of first-degree burglary are (1) the breaking and entering (2) of an occupied dwelling of another (3) in the nighttime (4) with the intent to commit a felony therein." *State v. Graham*, 186 N.C. App. 182, 196, 650 S.E.2d 639, 649 (2007) (citations and quotation marks omitted). Thus, for this Court to determine defense counsel committed *per se Harbison* error, counsel must have admitted each element of one or both of the crimes above. *See Foreman*, 270 N.C. App. at 789, 842 S.E.2d at 188.

Defendant argues *Harbison* error occurred first during opening statements when defense counsel argued

> [Pamela] sustained seven wounds, cut wounds. You'll hear about (indiscernible) of these wounds, but a number of these wounds, four of these wounds I believe were assessed to be superficial wounds, and only one of these wounds was fatal. That does not change that my client is the one who inflicted that wound.

Defense counsel then stated Defendant "acknowledged the entirety of the - - of the confrontation that he had with" Pamela and Defendant "gave his statement and then tried to deny his involvement in the altercation." Then, defense counsel argued

> the actual blows being exchanged, who had what at the time when the injuries were inflicted, the only two people who actually saw that were [Defendant] and [Pamela]. Everything else about the circumstances is a matter of you viewing all these facts and trying to assess what do they really mean. The only thing we do know is that very unfortunately, [Pamela] - - [Pamela] is deceased. [Defendant] and she were engaged in this struggle.

Later in the trial, just before the State completed presenting evidence, the trial court asked if Defendant planned to testify, and Defendant's counsel stated he would not testify but he would present evidence. The State then noted its motion in limine filed before trial asking to "prohibit . . . [D]efendant from offering any evidence of any out of court exculpatory statements, otherwise known as self-serving statements, made by . . . [D]efendant or made by . . . [D]efendant to other witnesses until . . . [D]efendant testified at trial or the [c]ourt determined they are otherwise admissible[.]" The State indicated the motion was based on the 19 November 2018 interview of Defendant by Detective Patterson, which the State had not introduced as evidence and the State contended was inadmissible as hearsay. Defendant's

counsel argued strenuously that he should be allowed to present the video because Defendant's statements in the interview were admissions of a party opponent and thus not hearsay. After an extended argument regarding the admissibility of the interview video during Defendant's evidence, the trial court took a thirty-minute break to review the State's memo regarding the motion in limine. Later in the day, the trial court also watched the video of the interview. Defendant began presenting other evidence, and at the end of that day, the trial court ruled on the State's motion in limine and determined the videotape of the interview would not be admitted unless Defendant testified. The next day, Defendant's counsel advised the trial court that Defendant would testify, although he noted that "we are renewing our strenuous objection to being required to place my client on the stand as a prerequisite to our playing the recorded videotape of" the interview with Detective Patterson. Defendant then testified and presented the videotape of the interview. Defendant does not raise any argument on appeal regarding his decision to testify or the trial court's ruling on the State's motion in limine.

At trial, Defendant contended that he was highly intoxicated before he went to Sherry's house. He presented evidence that at 1:44 am on the morning of 17 November 2018, he was so intoxicated that law enforcement found him passed out and lying on a roadway so they had called for ambulance service and he was taken to the emergency room of Southeastern Regional Medical Center. About two hours later, he was out of the hospital and law enforcement found him in a bowling alley

parking lot, still highly intoxicated. In the closing argument, Defendant's counsel argued that Defendant "was stinking drunk, he was drunk out of his mind" when he arrived at Sherry's house. Because he was so intoxicated, Defendant's counsel argued Defendant could not have possibly had the state of mind or intent required for murder.

Defendant argues that the presentation of the video of Defendant's interrogation was also *Harbison* error since "the recorded interrogation of [Defendant] contain[ed] admissions to certain elements of the offenses[.]" Finally, Defendant contends a portion of defense counsel's closing arguments also implicates *Harbison*; in the contested argument, Defendant's counsel argued:

> while [Defendant's] behavior in tearing up a door and whatever else he might have done in there was - - and I'm not talking about the awful thing that happened with [Pamela], I'm talking about in terms of the property, that that - - despite all that other stuff that he may have done, breaking up doors and stuff, Sherry Bridgeman had no better right to be on that - - those premises, to be in that room where [Defendant's] clothes, his cherished pictures, his wallet and all were, she had no more right than [Defendant] did as far as that is concerned.

But Defendant ignores the next part of the closing, which states:

> I'm limiting this part of my discussion solely to the question of the alleged burglary. I submit to you there was no burglary. I mean, there was some bad things going on in there, but a burglary was not a one of them. And - - and my client's guilt on the other things is very questionable.

Defendant mostly argues on appeal that "counsel told the jury at the outset,

without [Defendant's] informed consent, that [Defendant's] act was the proximate cause of [Pamela's] death" and that defense counsel "acknowledged to the jury in various ways that [Defendant] broke up property, busted in a door, tore up a door, and broke up a door."

In *State v. Strickland*, our Supreme Court was confronted with a case where a defendant argued *Harbison* error since his counsel made "repeated statements during jury selection that [the] defendant was holding the gun that killed the victim at the time the victim was shot [which] amounted to a concession of guilt to which [the] defendant had not agreed." 346 N.C. 443, 453, 488 S.E.2d 194, 200 (1997). In discussing whether *Harbison* error occurred, the Supreme Court articulated what defense counsel said when the prosecution attempted to put a *Harbison* admission on the record:

> [t]hat [the victim] was shot with a shotgun and at the time it was in my client's hands. That, your honor, is not an admission of guilt and we don't intend for it to be an admission of guilt. To the extent that it can be interpreted as admission of guilt, and it shouldn't be, we do not intend that that in any way be interpreted as an admission of guilt. We intend it to be an accurate statement of the circumstances that occurred at the time of the incident in question.

*Id*. at 454, 488 S.E.2d 200. The Court concluded

> that the statements made by defense counsel did not amount to an admission of [the] defendant's guilt. The uncontroverted evidence in this case was that [the] defendant had been holding the gun when Mr. Brown was shot. Defense counsel's statements were not the equivalent

of asking the jury to find [the] defendant guilty of any charge, and therefore, *Harbison* does not control.

*Id.*

We find this case similar to *Strickland*. As to the first-degree murder charge, admitting Defendant was the proximate cause of Pamela's death is not an admission of guilt to the entire offense. Even if the stabbing was the proximate cause of Pamela's death, the State was still required to prove Defendant acted "with malice, premeditation, and deliberation." *Bedford*, 208 N.C. App. at 417, 702 S.E.2d at 526. There is nothing in the record suggesting defense counsel admitted any of these states of mind required to find Defendant guilty of first-degree murder with malice, premeditation, or deliberation. Instead, Defendant's defense was that he was so intoxicated that he could not have had the state of mind required for him to be guilty of murder.

As to the first-degree burglary charge, Defendant argues defense counsel admitted proximate cause, and that he "broke up property, busted in a door, tore up a door, and broke up a door." Defendant argues "[i]n other words, trial counsel conceded to the jury, without [Defendant's] informed consent, that [Defendant] broke the door and entered the bathroom while carrying a knife – a deadly weapon." But again, defense counsel did not admit this was done with "the intent to commit a felony therein." *Graham*, 186 N.C. App. at 196, 650 S.E.2d at 649. As the State argues in its brief, both first-degree murder and first-degree burglary "demanded a specific

*mens rea.*" And shortly after the part of defense counsel's closing Defendant contends was *Harbison* error, defense counsel stated "I submit to you there was no burglary. I mean, there was some bad things going on in there, but a burglary was not a one of them."

Defense counsel argued throughout his closing argument that, essentially, Defendant was too intoxicated at the time of the crimes to have the requisite intent. Counsel discussed intent by arguing:

> If the law requires that the State prove beyond a reasonable doubt a specific intent to commit the crime, and a person is so intoxicated, whether it's by drugs, alcohol, whatever, that that person cannot achieve that intent. And in this case we're talking about premeditation, deliberation. We're talking about intent to kill.

Therefore, counsel may have admitted certain relevant facts or elements of first-degree murder or first-degree burglary, but he did not admit guilt to each essential element in a way that implicates *Harbison*.[2] *See Foreman*, 270 N.C. App. at 788-89, 842 S.E.2d at 188; *see also Wiley*, 355 N.C. at 620, 565 S.E.2d at 42. This argument is overruled.

### III.    Admission of Evidence

Next, Defendant argues "the trial court committed reversible error by allowing

---

[2] We note Defendant was also found guilty of first-degree murder under the felony murder rule with the underlying felony being burglary, which Defendant was separately convicted of. As defense counsel did not admit each essential element of burglary or first-degree murder with malice, premeditation, and deliberation, we need not separately discuss the felony murder rule.

the admission, over objection, of State's Exhibit 31 – a pair of scissors, State's Exhibit 41 – a photo of the pair of scissors, and testimony concerning this evidence." (Capitalization altered.)  Defendant states this evidence was irrelevant and unduly prejudicial, citing North Carolina Rules of Evidence 401, 402, and 403.  Even assuming the trial court erred in admitting the evidence, Defendant has failed to show prejudice, thus we conclude there was no reversible error.

> Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal. Because the trial court is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable, the appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the abuse of discretion standard which applies to rulings made pursuant to Rule 403.

> Thus, a Rule 401 review is less deferential than a Rule 403 review which considers whether the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.

*State v. Tysinger*, 275 N.C. App. 344, 351-52, 853 S.E.2d 189, 194 (2020) (citations and quotation marks omitted).  But importantly,

> [e]ven where this Court finds the trial court's evidentiary decision was in error, . . . evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial. A defendant is prejudiced by evidentiary error when there is a reasonable probability that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal

arises.

*State v. Teel*, ___ N.C. App. ___, ___, 909 S.E.2d 541, 549 (2024) (citations and quotation marks omitted).

Here, Defendant argues a pair of scissors found at the scene, which were not used in the murder, were not relevant and were more prejudicial than probative since there was evidence admitted that Defendant had previously stabbed a woman with a pair of scissors. Defendant does not contend the admission of the testimony about the prior stabbing was error, only that the admission of the scissors found at the scene that were not used in the murder was error.

However, Defendant fails to show prejudice sufficient to justify a new trial even assuming the scissors were admitted in error. The State presented evidence that Defendant and Pamela had a long and abusive relationship; Defendant showed up to Sherry's house at 4:00 am and became belligerent after Pamela asked why Defendant needed to get his stuff at that time; Defendant grabbed a knife and threatened to harm Sherry if she did not get out of his way; Defendant broke down Pamela's bedroom and bathroom door; Sherry heard Pamela screaming Defendant was going to kill her; and deputies that responded to the scene testified Defendant stated that he stabbed Pamela. Defendant himself testified that he broke in the bottom half of the bathroom door, crawled under the door, and stabbed Pamela multiple times. Although the State's evidence was that Defendant stabbed Pamela with a butcher knife, Defendant's attorney sought to raise a question regarding the evidence based

on the presence of both a paring knife and a butcher knife at the scene and the State's failure to present evidence of fingerprints from the knives. Defendant claimed Pamela was the one with a knife and he only took it from her after crawling under the door he broke down. But in any event, Defendant was not prejudiced by any alleged evidentiary error involving the scissors. *See id.* This argument is overruled.

## IV.    Shirts Worn in the Courtroom

Finally, Defendant contends "the trial court erred by overruling [Defendant's] objection to courtroom spectators, and in particular family members of the decedent and the victim of the 404(b) prior assault, wearing advocacy t-shirts depicting phrases such as 'Justice for Mom.'" (Capitalization altered.) We disagree.

Defendant contends this issue is reviewed for abuse of discretion as it arises under North Carolina General Statute Sections 15A-1033 and 15A-1034 but also that we review the issue *de novo* as it "implicat[es] . . . [D]efendant's constitutional rights[.]" We reviewed this issue for abuse of discretion in *State v. Braxton*, 344 N.C. 702, 477 S.E.2d 172 (1996). In *Braxton*, our Supreme Court was addressing a motion for a mistrial made by the defendant due to "members of the audience . . . wearing badges that appeared to be photographs of one of the victims." *Id.* at 709-10, 477 S.E.2d at 176. The defendant "argue[d] that the wearing of badges by spectators was an attempt to influence the jury and was inherently prejudicial to [the] defendant's right to a fair trial." *Id.* at 710, 477 S.E.2d at 176. We ultimately concluded there was "no error in the trial court's *exercise of discretion* regarding the wearing of

buttons with photographs in this case." *Id*. at 710, 477 S.E.2d at 177 (emphasis added). We also addressed this issue in *State v. Maness*, where the defendant "argue[d] that the denial of his motion was, under the totality of the circumstances, an abuse of discretion *and that his constitutional rights to a fair trial and a reliable sentencing proceeding were violated*." 363 N.C. 261, 280, 677 S.E.2d 796, 808 (2009) (emphasis added). Our Supreme Court again concluded "[w]e will not second-guess the trial court to presume that this incident was fatally prejudicial as a matter of law, and *we do not perceive any abuse in the judge's exercise of his discretion* to deny [the] defendant's motion for a mistrial." *Id*. at 282, 677 S.E.2d at 810 (emphasis added).

Under North Carolina General Statute Section 15A-1033, "[t]he judge in his discretion may order any person other than a defendant removed from a courtroom when his conduct disrupts the conduct of the trial." N.C. Gen. Stat. § 15A-1033 (2023). And under North Carolina General Statute Section 15A-1034(a), "[t]he presiding judge may impose reasonable limitations on access to the courtroom when necessary to ensure the orderliness of courtroom proceedings or the safety of persons present." N.C. Gen. Stat. § 15A-1034(a) (2023). "In the conduct of jury trials, much must necessarily be left to the judgment and good sense of the judge who presides over them[.]" *State v. Dean*, 196 N.C. App. 180, 189, 674 S.E.2d 453, 460 (2009).

After fourteen days of trial, Defendant "strongly object[ed] . . . to family members of the victim in this case as well as family members of the other case . . . being allowed to sit in this courtroom, be in this courtroom, wearing advocacy tee

shirts." The record is silent as to whether these shirts were worn throughout the entire trial or only on the fourteenth day. Defendant argued "[t]his [was] an advocacy attempt trying to influence the jury." The trial court overruled the objection, stating:

> Off the top of my head I would say that what I--the shirts I see that say Justice for Mom is not the--find the defendant guilty or punish the defendant shirts like I've seen that I know would be wrong. The Justice for Mom doesn't seem that bad of a tee shirt. The only thing I would say right now is I'd probably ask for the, other than the lady on the end, the other three to just move back a row for right now when the jury comes back.
>
> I mean, I've seen the shirts both ways. I've let shirts stay in here that didn't say something about what the verdict should be. But I'm going to double check my research. I don't want to make a mistake this late in the game.

Defendant renewed the objection and the trial court again denied it, stating:

> So let me go ahead and put on the record my ruling about the shirts. We talked about it in chambers. And the ruling is, ladies, I'll let you wear the shirts in court, okay? I'm allowing the one lady to sit there on the front row. And then everybody else on a row behind her, at least, okay?
>
> And my interpretation of the law - - and it is in my discretion - - is that as long as your shirts don't say what the verdict should be, as long as it don't say something, like, find the defendant guilty or something like that, that I can allow it to be worn in the courtroom. The Justice for Mom is okay in my opinion.

Defendant contends the court must have "perceived an issue with the advocacy t-shirts as he required all but one of the women to move back, and presumably, further away from the jury." But the trial court specifically stated "as long as your

shirts don't say what the verdict should be, . . . I can allow it to be worn in the courtroom." This is a proper exercise of the trial court's discretion.

Defendant cites to *Braxton*, 344 N.C. 702, 477 S.E.2d 172, for the contention that our Supreme Court "would agree with the premise of" three cases from other jurisdictions where the defendant received a new trial due to prejudicial attire worn in the courtroom during trial. Specifically, the Court stated:

> Although this issue appears to be one of first impression in North Carolina, [the] defendant cites several cases from other states where the wearing of certain items of clothing or accessories led to declarations of mistrial. *Woods v. Dugger,* 923 F.2d 1454 (11th Cir.) (presence of numerous uniformed prison guards in the audience of a trial for the murder of a prison guard deprived [the] defendant of a fair trial), *cert. denied,* 502 U.S. 953, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991); *Norris v. Risley,* 918 F.2d 828 (9th Cir.1990) (presence of female spectators wearing large buttons with the slogan "women against rape" in the audience of a trial for kidnapping and sexual intercourse without consent deprived [the] defendant of a fair trial); *State v. Franklin,* 174 W.Va. 469, 327 S.E.2d 449 (1985) (wearing by several spectators, including the sheriff, of MADD lapel buttons in trial for driving under the influence resulting in death deprived [the] defendant of a fair trial).

*Id*. at 710, 477 S.E.2d at 176-77. But our Supreme Court concluded the rulings in those cases were distinguishable and stated the record was insufficient to decide the issue since

> [t]here are no facts in the record showing the number and identity of the spectators wearing the buttons, the identity of the person shown in the photograph, and whether the jury even noticed the buttons. There was no showing that the individuals in the audience belonged to a well-known

- 19 -

> organization, such as MADD, NOW, or the Rape Task Force, or that they were prison guards. Similarly, there is no evidence that the badges exclaimed a specific message. The trial judge was left merely to assume that the people were members of the victims' families and that the photographs were of the victims. The trial judge even commented that he did not know how the jury could have known who was shown in the photographs.

*Id.* at 710, 477 S.E.2d at 177. Defendant contends "*Braxton* suggests that upon a sufficient record, our Supreme Court would agree with the premise of those cases[,]" but Defendant submits no binding authority that allowing the shirts in this case was inherently prejudicial and warrants a new trial.

Here, our record shows that on at least one day of the trial, there was an unknown number of people wearing the shirts stating "Justice for Mom." According to Defendant's counsel, they were family members of Pamela or the prior assault victim. The record does not show how many people were wearing the shirts or whether the jury was able to see all the shirts. The shirts stated "Justice for Mom" but had no other words or pictures which may invoke an emotional response from the jury, even assuming the jury could see the shirts and, as the trial court noted, did not specifically ask to convict Defendant. We also note the objection was made at the end of trial, and the record does not show if the shirts were worn throughout the entire trial or only on the day Defendant raised the objection. In any event, the trial court moved some of the people further back in the audience away from the jury even after determining it was not required to do so. As in *Maness*, "[w]e will not second-guess

the trial court to presume that this incident was fatally prejudicial as a matter of law[.]" *Maness*, 363 N.C. at 282, 677 S.E.2d at 810. We conclude the trial court did not err in denying Defendant's motion.

## V.    Conclusion

Defendant's counsel did not commit *Harbison* error as counsel did not admit to each essential element of the crimes charged. Defendant was also not prejudiced by any alleged evidentiary error involving admission of the evidence of scissors at the scene. Finally, the trial court did not err in allowing some people in the courtroom to wear shirts saying "Justice for Mom" and properly exercised its discretion in requesting some of the people to move farther away from the jury. We conclude Defendant received a fair trial, free from prejudicial error.

NO ERROR AND NO PREJUDICIAL ERROR.

Judges GRIFFIN and FLOOD concur.

Report per Rule 30(e).